HENRY C. STEPHENSON, JR., AND ANOTHER v.
PLASTICS CORPORATION OF AMERICA, INC.,
AND ANOTHER.
UNITED FABRICATORS AND
ELECTRONICS, INC., RESPONDENT.

150 N. W. (2d) 668.

April 28, 1967—No. 40,727.

*Lindquist, Magnuson & Glennon, William T. Dolan,* and *William B. Stukas,* for appellants.

*Dorsey, Owen, Marquart, Windhorst & West, Robert J. Johnson, John D. Levine,* and *Michael W. Wright,* for respondent.

SHERAN, JUSTICE.

Appeal from a district court judgment.

Action was instituted by plaintiffs against defendants on the theory that defendant Plastics Corporation of America, Inc., (hereafter called Plastics) breached contract obligations springing from stock purchase warrants issued by it, and that defendant United Fabricators and Electronics, Inc., (hereafter called United) participated in the resulting wrong to the plaintiffs by conduct constituting willful and malicious interference with the contract relationship. Defendant Plastics denied the claimed breach of contract and cross-claimed for indemnity as against United in the event plaintiffs should prevail. United denied the alleged breach of contract and the asserted unlawful interference. Each defendant moved for judgment on the pleadings. United's motion was granted; Plastics' was denied.

In deciding whether the order of the trial judge in United's favor can be sustained, we are limited to the facts asserted in the pleadings interpreted in the light most favorable to the plaintiffs.[1]

## THE WARRANTS

The stock subscription warrants are dated December 16, 1960. It will be helpful, at the outset, to place their provisions in these compartments:

(A) The principal object of the agreements.

(B) Corporate changes conceived as affecting the principal object of the agreements.

(C) Mechanisms provided for preserving the principal object of the agreements in the event of such changes.

(D) Provisions for notice of such corporate changes.

## A. PRINCIPAL OBJECT

The principal object of the agreements was to afford the holders or their assigns (such as these plaintiffs) the option for a period of 5

---

[1] See, Rule 12.03, Rules of Civil Procedure; Northern States Power Co. v. Franklin, 265 Minn. 391, 122 N. W. (2d) 26; Grier v. Estate of Grier, 252 Minn. 143, 89 N. W. (2d) 398; Nationwide Corp. v. Northwestern Nat. Life Ins. Co. 251 Minn. 255, 87 N. W. (2d) 671, 73 A. L. R. (2d) 884.

years to obtain 30,000 shares of the "capital" stock of the company at the price of $1 per share. It is specifically provided that the warrants were not to entitle the holders to any voting rights or other rights as a stockholder of the company.

## B. Anticipated Corporate Changes

In an apparent effort to prevent a defeat of the basic purpose of the warrants by a change in corporate circumstances, 12 different possible situations are anticipated in paragraph 3 of the agreements:

(1) A distribution upon capital stock payable in capital stock, i. e., a "stock dividend." [2]

(2) A division ("split") of the outstanding capital stock.[2]

(3) A combining ("reverse split") of outstanding capital stock.[2]

(4) A cash dividend upon stock not payable from net earnings or earned surplus.[3]

(5) *Such a dividend upon stock but not payable in cash.*[3]

---

[2] 3(a). "In case the Company shall declare any dividend or other distribution upon its outstanding capital stock payable in capital stock or shall subdivide its outstanding shares of capital stock into a greater number of shares, then the number of shares of capital stock which may thereafter be purchased upon the exercise of the rights represented hereby shall be increased in proportion to the increase through such dividend or subdivision and the purchase price per share shall be decreased in such proportion. In case the Company shall at any time combine the outstanding shares of its capital stock into a smaller number of shares, the number of shares of capital stock which may thereafter be purchased upon the exercise of the rights represented hereby shall be decreased in proportion to the decrease through such combination and the purchase price per share shall be increased in such proportion."

[3] 3(b). "In case the Company shall declare a dividend upon the capital stock payable otherwise than out of earnings or surplus (other than paid-in surplus) or otherwise than in capital stock, the purchase price per share in effect immediately prior to the declaration of such dividend shall be reduced by an amount equal, in the case of a dividend in cash, to the amount thereof payable per share of the capital stock or, in the case of any other dividend, to the fair value thereof per share of the capital stock as determined by the Board of Directors of the Company. For the purposes of the foregoing a dividend other than in cash shall be considered payable out of earnings or surplus (other than paid-in surplus) only to the extent that such earnings or

(6) *A capital "reorganization."* [4]

(7) A reclassification of stock. [4]

(8) A consolidation with another corporation. [4]

(9) A merger with another corporation. [4]

(10) *The sale of all or substantially all of the assets of the corporation to another corporation.* [4]

(11) An offer to holders of capital stock for pro rata subscription for additional shares of stock or any other rights. [5]

(12) A voluntary or involuntary dissolution. [5]

---

surplus are charged an amount equal to the fair value of such dividend as determined by the Board of Directors of the Company. Such reductions shall take effect as of the date on which a record is taken for the purpose of such dividend, or, if a record is not taken, the date as of which the holders of capital stock of record entitled to such dividend are to be determined."

[4] 3(c). "If any capital reorganization or reclassification of the capital stock of the Company, or consolidation or merger of the Company with another corporation, or the sale of all or substantially all of its assets to another corporation shall be effected, then, as a condition of such reorganization, reclassification, consolidation, merger or sale, lawful and adequate provision shall be made whereby the holder hereof shall thereafter have the right to purchase and receive upon the basis and *upon the terms and conditions specified in this Warrant* and in lieu of the shares of the capital stock of the Company immediately theretofore purchasable and receivable upon the exercise of the rights represented hereby, such shares of stock, securities or assets as may be issued or payable with respect to or in exchange for a number of outstanding shares of such capital stock equal to the number of shares of such capital stock immediately theretofore purchasable and receivable upon the exercise of the rights represented hereby had such reorganization, reclassification, consolidation, merger or sale not taken place, and in any such case appropriate provision shall be made with respect to the rights and interests of the holder of this Warrant to the end that the provisions hereof (including without limitation provisions for adjustment of the purchase price per share and of the number of shares purchasable upon the exercise of this Warrant) shall thereafter be applicable, as nearly as may be in relation to any shares of stock, securities or assets thereafter deliverable upon the exercise hereof." (Italics supplied.)

[5] Reference to situations 11 and 12 is to be found in the notice provision set out in footnote 11.

## C. CONTEMPLATED ADJUSTMENT

In the event of the occurrence of situations 1 to 3 (stock dividends; splits; reverse splits) the warrants provide for adjustment by decrease or increase in the number of shares purchasable and the price per share to be paid.[6]

In situations 4 and 5 (depleting dividend) the adjustment is to be accomplished by reducing the purchase price per share (i. e., $1 per share) by (a) the amount of the dividend, if paid in cash, and (b) the fair value of distributed assets other than cash.[7]

In situations 6 to 10 (reorganization; stock reclassification; consolidation; merger; sale of all or substantially all assets) it is required by paragraph 3(c) of the agreement that "appropriate provision" be made for the protection of the rights and interests of the warrant holders.[8]

Paragraph 3(c) which deals with situations 6 to 10 concludes with this sentence:

"* * * Any such shares of stock, securities or assets which the holder hereof may be entitled to purchase pursuant to this paragraph (c) shall be included within the term 'capital stock' as used herein."

This sentence becomes significant when considered in conjunction with paragraph 2 of the agreements which concludes with this sentence:

"* * * The Company further covenants and agrees that *during the period within which the rights represented by this Warrant may be exercised*, the Company will at all times have authorized, and reserved, a sufficient number of shares of capital stock to provide for the exercise of the rights represented by this Warrant * * *." (Italics supplied.)

We interpret these provisions, considered together, to impose on Plastics an obligation to have reserved a sufficient number of shares of United stock to provide for the exercise of the rights represented by the warrants if the arrangement planned and executed by the seven

---

[6] See footnote 2, *supra*.

[7] See footnote 3, *supra*.

[8] See footnote 4, *supra*.

directors of the two corporations, described hereinafter, amounted to a *reorganization;* stock reclassification; consolidation; merger; or *a sale of all or substantially all of Plastics' assets to United.*

Paragraph 3(c) provided with respect to situations 8 to 10 (consolidation; merger; sale of all or substantially all of assets) that the successor corporation should be required to assume "the obligation to deliver to such [warrant] holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, such holder may be entitled to purchase." [9]

### D. NOTICE PROVISIONS

In situations 1 to 3 (stock dividends; splits; reverse splits) set out above, the company obligates itself to give notice to the warrant holder stating "the purchase price per share resulting from such adjustment and the increase or decrease, if any, in the number of shares purchasable at such price upon the exercise of this Warrant." [10]

In situations 1 (stock dividend) and 4 to 12 (dividends; reorganization; reclassification; consolidation; merger; sale of all or substantially all of assets; subscription offer; dissolution) a 20-day notice to the

---

[9] 3(c). "* * * The Company shall not effect any such consolidation, merger or sale, unless prior to or simultaneously with the consummation thereof the successor corporation (if other than the Company) resulting from such consolidation or merger or the corporation purchasing such assets shall assume by written instrument executed and mailed or delivered to the holder hereof at the last address of such holder appearing on the books of the Company, the obligation to deliver to such holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, such holder may be entitled to purchase."

[10] 3(d). "Upon any adjustment of the number of shares of capital stock which may be purchased upon the exercise of the rights represented hereby and/or of the purchase price per share, then and in each such case the Company shall give written notice thereof, by first class mail, postage prepaid, addressed to the holder of this Warrant at the address of such holder as shown on the books of the Company, which notice shall state the purchase price per share resulting from such adjustment and the increase or decrease, if any, in the number of shares purchasable at such price upon the exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based."

warrant holder is required by paragraph 3(e) which notice in situations 4 and 5 (dividends), 11 (subscription offer), and 12 (dissolution) at least, must specify "the date on which the holders of capital stock shall be entitled thereto," and in situations 6 (reorganization), 7 (reclassification), 8 (consolidation), 9 (merger), 10 (sale) and 12 (dissolution) must specify "the date on which the holders of capital stock shall be entitled to exchange their capital stock for securities or other property." [11]

### The Corporate Change

In the latter part of 1964 and at a time when the warrants analyzed

---

[11] 3(e). "In case at any time:

"(1) the Company shall pay any dividend payable in stock upon its capital stock or make any distribution (other than regular cash dividends paid at an established annual rate) to the holders of its capital stock;

"(2) the Company shall offer for subscription pro rata to the holders of its capital stock any additional shares of stock of any class or other rights;

"(3) there shall be any capital reorganization, or reclassification of the capital stock of the Company, or consolidation or merger of the Company with, or sale of all or substantially all of its assets to, another corporation; or

"(4) there shall be a voluntary or involuntary dissolution, liquidation or winding up of the Company; then, in any one or more of such cases, the Company shall give to the holder of this Warrant (aa) at least twenty days' prior written notice of the date on which the books of the Company shall close or a record shall be taken for such dividend, distribution or subscription rights or for determining rights to vote in respect of any such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding up, and (bb) in the case of any such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding up, at least twenty days' prior written notice of the date when the same shall take place. Such notice in accordance with the foregoing clause (aa) shall also specify, in the case of any such dividend, distribution or subscription rights, the date on which the holders of capital stock shall be entitled thereto, and such notice in accordance with the foregoing clause (bb) shall also specify the date on which the holders of capital stock shall be entitled to exchange their capital stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding up, as the case may be. Each such written notice shall be given by first class mail, postage prepaid, addressed to the holder of this Warrant at the address of such holder as shown on the books of the Company."

above were outstanding, Plastics was controlled and governed by a board of seven directors who agreed among themselves:

(1) A part of the assets of Plastics then devoted to the production of thermoplastic products by one of the divisions of Plastics should be transferred to a newly created corporation; the newly created corporation should, in exchange, transfer *all* of its stock to Plastics. (The new corporation, United Fabricators and Electronics, Inc., which we refer to as "United," was incorporated March 11, 1965.)

(2) *All* of the stock of the newly created corporation to be transferred to Plastics should be distributed to Plastics shareholders of record on February 22, 1965, and warrant holders exercising their stock options by March 16, 1965. (This agreement to distribute all of the stock of the newly created corporation to Plastics shareholders of necessity made it impossible for Plastics to reserve a sufficient number of shares of United's stock to provide for the exercise of an option with respect to such stock after March 16, 1965, but before expiration of the 5-year option period.)

(3) Three of the seven directors then in control of Plastics should resign and become the directors of United. The four remaining should continue in control of Plastics.

(4) The United stock to be acquired by the four directors of Plastics as a result of the distribution contemplated by step (2) above should be exchanged for the Plastics stock held by the three departing directors so that the one group would be in control of United and the other in control of Plastics when the transaction was completed.

Agreements were made intending to bind the seven directors and the corporations (Plastics and United) to this plan, and these agreements have been fully executed.

On February 24, 1965, Plastics gave notice to holders of stock purchase warrants, including plaintiffs, reading as follows:

"You are hereby notified that the Directors of Plastics Corporation of America, Inc. have authorized a distribution on March 31, 1965 to the common shareholders of said corporation of one (1) share of United Fabricators & Electronics, Inc. for each two (2) shares of

Plastics Corporation of America, Inc. held of record on February 22, 1965.

"Inasmuch as the holders of Stock Purchase Warrants of Plastics Corporation of America, Inc. are entitled to twenty days' notice of such distribution, the Directors have established March 16, 1965 as the record date for such distribution for the holders of Stock Purchase Warrants who shall hereafter become a shareholder by reason of the exercise of such Warrants."

Plaintiffs did not undertake to exercise their option to purchase Plastics stock until December 1965. We assume for present purposes (but do not decide) that they made an effective exercise of the option embodied in the warrants before the expiration of the 5-year period specified in it.

The theory of plaintiffs' pleading is that they are entitled upon exercise of their option before the expiration of the 5-year period to have the shares of Plastics stock specified in the warrants and in addition that number of the shares of United stock which would have been distributed to plaintiffs had they been stockholders when the distribution of United stock was in fact made; and that if specific performance is impossible, damages should be awarded.

■ In our opinion, the order of the trial court granting judgment for United against plaintiffs on the pleadings can be sustained if, but only if, any one of these legal conclusions follow from the facts summarized:

(a) The warrants created no right in plaintiffs to share in the distribution of United stock in any event.

(b) Any right to share in the distribution of United stock was extinguished by plaintiffs' failure to exercise their option within the time specified by the notice.

(c) The right of plaintiffs to share in the distribution of United stock springs from the contracts between plaintiffs and Plastics; and United did nothing to interfere with or obstruct the performance of these contracts.

■ If the distribution of United stock was a dividend *not* charged

to net earnings or earned surplus, plaintiffs would have no right as against United because in such event, by the terms of the warrants, plaintiffs' position was to be protected by reducing the purchase price per share of Plastics stock by the fair value of the United stock determined as of the date of distribution. In our opinion, it cannot be held on the present record that the parties to the warrants intended a transaction of this kind to be treated as a dividend.

Minn. St. 301.22, subd. 2, provides:

"A corporation may declare dividends in cash or property only as follows:

"(1) Out of earned surplus;

"(2) Out of paid-in surplus * * *;

"(3) Out of its net earnings for its current or for the preceding fiscal year * * *."

There is a difference between the transactions involved in the present case and a "dividend" in the usual sense of that word. In Hoberg v. John Hoberg Co. 170 Wis. 50, 173 N. W. 639, 173 N. W. 952, it was held that a corporation's pro rata distribution to its stockholders of recently acquired stock of another corporation was not a dividend, emphasizing that no attempt was made to meet a dividend obligation by the transfer. See, 13 Wd. & Phr. pp. 94, 104. In determining whether a transaction constitutes a "dividend," consideration must be given to the context in which the term "dividend" is used; the consequences that turn upon the answer to the question; and the facts of the particular case. See, 13 Wd. & Phr. p. 94. We believe that it would be premature to rule as a matter of law upon the limited record now before us that the present transaction was intended to be a "dividend" within the meaning of the warrants.

Ordinarily the object of a dividend is to enable the shareholders to enjoy the fruits of a corporate operation. It is at least inferable that the purpose of the distribution of United's stock to Plastics shareholders was intended primarily (a) to enable the directors who remained with Plastics to acquire the stock of that corporation distributed to the three directors who were taking over the management of United and (b) to give the three departing directors control of the newly created

corporation through exchange of their Plastics stock for the distributed shares of United coming into the hands of the four Plastics directors who remained. In fact it is reasonable to infer that this exchange of United's stock for Plastics after the distribution was an essential part of the agreement between the seven directors and that but for this understanding the "spin-off" would never have taken place. So considered, we cannot say that the warrants declare clearly and unambiguously that a transaction of this character was intended to be treated as a "dividend" within the meaning of the language of the warrants.

We do not disagree with United's contention that a "spin-off" can involve or be executed by a means of a dividend of a new company's stock to the old company's shareholders. See, Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. ed. 186; Siegel, *When Corporations Divide: A Statutory and Financial Analysis*, 79 Harv. L. Rev. 534. We hold only that the question cannot be resolved in the present situation without the aid of extrinsic evidence.

If the transaction does not represent a "dividend" within the meaning of the warrants, then what was it? Plaintiffs contend that it was a capital reorganization (situation 6 above) or a sale of all or substantially all of the assets of the corporation to another corporation (situation 10 above). If so (unless the notice set out above served to accelerate the time within which plaintiffs' option was exercisable with respect to the distribution), the corporation was obligated by the terms of the warrants to reserve a sufficient number of shares of United stock to permit the exercise of the right of the warrant holders to acquire it for the full 5-year term of the warrants. This is so because paragraph 3(c) of the agreement provides that, in the event of any capital reorganization or the sale of all or substantially all of the corporate assets to another corporation, "lawful and adequate provision shall be made whereby the holder hereof shall thereafter have the right to purchase and receive * * * such shares of stock, securities or assets as may be issued or payable with respect to or in exchange for a number of outstanding shares of such capital stock equal to the number of shares or such capital stock immediately theretofore

purchasable and receivable upon the exercise of the rights represented hereby had such reorganization, * * * or sale not taken place." The obligation to hold the required number of shares of United in reserve follows from the concluding sentence of paragraph 3(c)[12] requiring that any such shares of stock or assets be included within the term "capital stock" as used in the warrants.

■ Although not free from ambiguity, we believe it would be possible for the plaintiffs to establish that the transaction here involved was a "capital reorganization" within the meaning of the warrants. The net result was that each Plastics shareholder held an interest represented by stock in exactly the same assets after the transaction as before. Before the transaction this interest was represented by stock in one corporation only; after the transaction the interest was represented by stock held in two corporations. All that was changed was the "organization."

The pertinent Federal and Minnesota income tax provisions declare transactions of this kind to be "reorganizations."[13]

---

[12] The sentence, to which reference has been made, reads: "Any such shares of stock, securities or assets which the holder hereof may be entitled to purchase pursuant to this paragraph (c) shall be included within the term 'capital stock' as used herein."

[13] Section 368(a) of the 1954 Internal Revenue Code, 68A Stat. 120, 26 USCA, § 368(a), provides in part:

"(a) REORGANIZATION.—

"(1) IN GENERAL.—For purposes of parts I and II and this part, the term 'reorganization' means—

\* \* \* \* \*

"(D) a transfer by a corporation of *all or a part* of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356."

Section 355 covers, inter alia, a corporation's distributions to its shareholders of stock of a corporation which it controlled immediately before the distribution.

United cites Minn. St. 301.55, dealing with compromise arrangements and reorganizations of corporations in proceedings for dissolution, for the proposition that the Minnesota Business Corporation Law views a reorganization in the common business sense that at no time two or more going business corporations will be in existence. Even if § 301.55 were to state that the "reorganization" for the purposes of said statute involved the going out of existence of one corporation and the coming into existence of another,[14] which it does not, still this would not necessarily delineate the outer boundaries of the meanings of the term in question.

United points out that the warrant contracts provide that upon reorganization a warrant holder is entitled to receive *"in lieu of* the shares of the capital stock of the Company immediately theretofore purchasable and receivable" certain stock or other assets of the transferee corporation. (Italics supplied.) It asserts that this shows that the parties to the warrant contracts contemplated that upon the reorganization a new corporation would take over and completely supersede the old one.

However, this provision does not compel the interpretation defendant would give it. It may simply mean that the warrant holder is entitled to a certain amount of stock of the old corporation, and in addition thereto (and in lieu merely of *more* stock of the old corporation), a certain amount of stock of the new corporation. Especially is this interpretation justifiable in light of the fact that the words in question also control where there has been a sale of "all or substantially all" of Plastics' assets. In the event of a sale of only substantially all of Plastics' assets, the agreement probably contemplates the warrant holder receiving both Plastics stock and stock of the vendee.

---

Minn. St. 290.136, subd. 9(a)(1)(D), is identical to the Federal provision.

United asserts that the present transaction was taxed as an ordinary dividend rather than as a reorganization, but this fact does not establish that it was a dividend as the term is used in the warrant.

[14] The term is sometimes used in this sense. See, 15 Fletcher, Cyc. of Corporations (1961 Rev. ed.) § 7205; 36A Wd. & Phr. p. 712.

Defendant points out that the stock warrants' reference to Plastics' duty to require the "successor corporation" to assume the duty to honor the stock warrants covers *only* situations of consolidation, merger, or sale of all or substantially all of Plastics' assets and urges that this must mean that "capital reorganization" comprehends only situations involving a structural change *within* Plastics. But a change in Plastics' structure resulting in the birth of a new corporation is not necessarily excluded from the term "capital reorganization" by this language. The same may be said of the fact that the warrants referred to the giving of 20-day notice of the date that the books would close and a record would be taken "for determining rights to vote in respect of any such reorganization." Defendant insists this means that only "reorganizations" upon which shareholders vote in accordance with § 301.55 are included. Again, the argument is persuasive, but not so clear that plaintiffs should not be allowed to present evidence on the matter.

In the alternative, plaintiffs urge that the evidence may establish that the transaction was a sale of "all or substantially all" of Plastics' assets. The complaint does not allege any particular proportion of Plastics' assets as having been transferred, merely stating that "the assets of its United Fabricators and Electronics Division, and certain other assets" were transferred.[15] Thus, at this stage of the proceedings, no proper evidence has been adduced on such matters as the proportion of Plastics' assets which were transferred; the nature of those assets (as compared to that of the assets retained); the relationship of the assets transferred and of those retained to Plastics' past and present objects and purposes; or the degree to which the transfer was unusual and out of the ordinary course of Plastics' business. See,

---

[15] Defendant asserts that the claim that transfer was of substantially all of Plastics' assets "is clearly refuted by facts contained in the pleadings which make it clear that the spin-off involved something less than one-half of PCA's net worth," citing a portion of the complaint and certain documents made part of Plastics' pleadings. Plastics' pleadings are not to be considered as admitted on this motion on the pleadings; moreover, the portions cited do not clearly support defendant's assertion.

Stiles v. Aluminum Products Co. 338 Ill. App. 48, 86 N. E. (2d) 887; Philadelphia Nat. Bank v. B. S. F. Co. 41 Del. Ch. 509, 199 A. (2d) 557, reversed on other grounds sub nom. B. S. F. Co. v. Philadelphia Nat. Bank (Del.) 204 A. (2d) 746; 40 Wd. & Phr. p. 821.

## THE NOTICE

■ We cannot say as a matter of law that plaintiffs' right to share in the distribution of United stock was extinguished by plaintiffs' failure to exercise their option within the time specified in the notice of February 24, 1965, there being no express language in the warrants entitling the corporation to accelerate the time within which the option could be fully exercised.

Merritt-Chapman & Scott Corp. v. New York Trust Co. (2 Cir.) 184 F. (2d) 954, is a decision in which Circuit Judge Thomas W. Swan discusses the problem in an opinion with which Judge Learned Hand concurred and from which Judge Charles E. Clark dissented. The issue in that case was whether a notice strikingly similar to the one here involved served to accelerate the time limitation of an option in its application to a stock dividend. In holding that the option rights of the warrant holder embraced the stock dividend, even though the option was not exercised before the time specified in the notice, the majority opinion states (184 F. [2d] 958):

"* * * The appellee must, and does, contend that the notice provision is for the purpose of giving the warrant holders notice that unless they exercise their warrants by the record date, they will forfeit those promised rights. Certainly the language of [the provision] is not aptly chosen to express such a forfeiture * * *."

Circuit Judge Clark, in dissenting, reasoned that the provisions for notice appearing in the warrant there involved must have been intended to limit the power of the warrant holder to assert rights with respect to the stock dividend because no other purposes for the time limitation in the notice could be conceived. Why, he wrote, "should the draftsmen have painted the lily further unless the sixty days was intended as a definite period for the taking of some action?" 184 F. (2d) 960. The answer to this question may be found, we feel, in the

circumstance that the warrant holders are not entitled to any voting rights or other rights as stockholders of the company before effective exercise of the option to purchase. A function of the notice required by the terms of this warrant could be to notify the warrant holder of a corporate change which might make early acquisition of voting rights or other stockholders' prerogatives desirable and enable the warrant holders to improve their position by acquiring a stockholder status.

█ It is true that the rights of plaintiffs to share in the distribution of United stock must come from the contract between plaintiffs and Plastics embodied in the subscription warrants. If United did nothing to interfere with the performance of this contract, plaintiffs have no valid claim against it.

Recovery may be had for inducing breach of contract by showing: (1) The existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom. Snowden v. Sorensen, 246 Minn. 526, 75 N. W. (2d) 795; Royal Realty Co. v. Levin, 244 Minn. 288, 69 N. W. (2d) 667. *The burden of proving sufficient justification for interference is upon the defendant.* Bennett v. Storz Broadcasting Co. 270 Minn. 525, 134 N. W. (2d) 892; Royal Realty Co. v. Levin, *supra;* Carnes v. St. Paul Union Stockyards Co. 164 Minn. 457, 205 N. W. 630, 206 N. W. 396; Prosser, Torts (3 ed.) § 123, p. 967.

Interference is unjustifiable when it is done "for the indirect purpose of injuring the plaintiff, or of benefiting the defendant, at the expense of the plaintiff." (Italics omitted.) Johnson v. Gustafson, 201 Minn. 629, 634, 277 N. W. 252, 255, quoting from Louis Kamm, Inc. v. Flink, 113 N. J. L. 582, 587, 175 A. 62, 66, 99 A. L. R. 1.

The court in Johnson quoted with approval from Annotation, 84 A. L. R. 43, 52:

"'"Interference with Contract Relations," includes not merely the procurement of a breach of contract, but all invasion of contract relations, so that any act injuring or destroying persons or property

which retards, makes more difficult, or prevents performance, or makes performance of a contract of less value to the promisee, may fall within its scope, it may be said that, the interest in a contract being a property right, a party thereto has a right of action against persons who are by their conduct substantially interfering with the performance thereof.' " 201 Minn. 633, 277 N. W. 254.

This statement was again quoted with approval, albeit in dicta, in Royal Realty Co. v. Levin, 244 Minn. 288, 291, note 5, 69 N. W. (2d) 667, 671, note 4; and in Continental Research, Inc. v. Cruttenden, Podesta & Miller (D. Minn.) 222 F. Supp. 190, 198. See, Lundgren v. Freeman (9 Cir.) 307 F. (2d) 104, 118; Haggerty v. Burkey Mills, Inc. (E. D. N. Y.) 211 F. Supp. 835, 837;[16] Carpenter, *Interference with Contract Relations*, 41 Harv. L. Rev. 728, 731.

In light of the extreme importance of the element of motive in the interference-with-contract-relations tort,[17] and the fact that the com-

---

[16] In the case cited, the court refused to dismiss a counterclaim which alleged that plaintiff attempted to induce other employees to leave the defendant's employ, even though it did not appear that any employees left because of such inducement, reasoning (211 F. Supp. 837): "There may be prima facie liability for interference with contractual relations, short of actually inducing others to breach their contracts of employment, by acts which make performance of a contract more burdensome, difficult or impossible, and render performance of less or no value to the party thereto entitled to performance. [Citations omitted.]"

[17] See Royal Realty Co. v. Levin, 244 Minn. 288, 291, 69 N. W. (2d) 667, 671, where it is stated: "According to the vast majority of decisions, even though the means employed in procuring the breach are in themselves lawful, where the inducement is without justification it may nevertheless be actionable."

In Prosser, Torts (3 ed.) § 123, it is stated: "In actions for interference with economic relations, the defendant's motive or purpose frequently is the determining factor as to liability, and sometimes it is said that bad motive is the gist of the action."

Restatement, Torts, § 766, *comment m*, states: "Ill will on the part of the actor toward the person harmed is not an essential condition of liability * * *. But the privileges * * * depend largely on the purposes of his conduct. If the actor does not act for the purpose of advancing the interest for the

plaint alleges defendant acted willfully and maliciously, it cannot be said that it appears to a certainty that under no facts which could be adduced consistent with the complaint could plaintiffs recover from United upon this ground.

This much is clear: The executed plan participated in by the seven directors and Plastics, controlled by four of them, and United, controlled by the other three, made it impossible for Plastics to distribute *all* of United stock to Plastics shareholders on March 31, 1965, and, at the same time, hold in reserve enough United stock to honor options exercisable until December 1965. If Plastics' failure to do the latter was a breach of contract, United, with or without justification, could be held to have abetted Plastics' incapacity to perform.

## CONCLUSION

The difficulty we have had with this case comes from the fact that the provisions of the warrants do not seem to deal specifically with a situation such as that described in the pleadings where, in an apparent effort to resolve a conflict in business judgment as between the directors, the assets of the original corporation are divided with one group given operating control of one phase of the corporate activity and the other assuming control of the balance. It is reasonable, in view of the elaborate effort to anticipate all possible changes that might affect the rights of warrant holders, to attribute to Plastics a general intent that the option rights of persons in the position of these plaintiffs should not be diminished by an arrangement which seems to have been particularly responsive to the needs of those in control of the corporation. But the language of the warrants is not so clear and unequivocal as to give a solution to the present problem without affording the parties an opportunity to present such evidence as may be available to clarify the ambiguities which have been discussed.

We do not decide that a case of unlawful interference with contract has been made by plaintiffs. Whether it has or not must depend

---

protection of which the privilege is given, he is not exercising the privilege and is not protected by it. No privilege is given to protect merely the interest in satisfying one's spite or ill will."

on the interpretation ultimately given to the warrants; upon whether the agreements and acts done pursuant thereto by United disabled and prevented Plastics from performing its obligations under the warrants; and whether, if so, United's participation in the transaction was justified.

We decide only that United was not entitled to judgment on the pleadings.

Reversed and remanded.