Gale K. NORDLING, petitioner,
Appellant,

v.

NORTHERN STATES POWER
COMPANY, et al.,
Respondents.

Nos. C7–90–1499, CX–90–1500.

Supreme Court of Minnesota.

Dec. 27, 1991.

James H. Kaster, Nichols, Kaster & Anderson, Minneapolis, for appellant.

Robert R. Reinhart, Melissa Raphan, Oppenheimer, Wolff & Donnelly, Minneapolis, for respondents.

Douglas A. Hedin, Andrea F. Rubenstein, Minneapolis, for amicus curiae MN Chapter National Employment Lawyers Ass'n.

SIMONETT, Justice.

In this case we decide that an employee who is in-house attorney for his corporate employer is not, by reason of the attorney-client relationship, precluded from making a claim against the employer for wrongful discharge. We conclude, also, that plaintiff's claim for tortious interference be returned to the trial court for further consideration.

Plaintiff-appellant Gale K. Nordling began working for defendant-respondent Northern States Power Company (NSP) in 1971 as an engineer. While working, he also attended law school with NSP's help and in 1975 became a duly licensed Minnesota attorney. For the next 12 years, Nordling was employed as an attorney in NSP's legal department. He worked primarily with the engineering departments, drafting contracts and handling negotiations for construction projects. His performance appears to have been exemplary and he consistently received above average performance ratings.

NSP's Employee Handbook, issued in 1984, contained a section on "Positive Discipline," a system intended to "gain commitment to change inappropriate behavior." There were three formal steps to the disciplinary procedure: an Oral Reminder; a Written Reminder; and a Decision Making Leave ("day off with pay for you to decide your commitment to the job"). The handbook went on to say: "Should the informal coaching and counseling and the three formal steps of Positive Discipline fail to bring about the appropriate behavior, an employee may be terminated." Another section of the handbook gave eight specific examples of conduct that could result in disciplinary action or discharge. Along with the hand-

book, NSP apparently issued separate guidelines to the supervisors, which stated that the disciplinary procedures were a guide and "not to be interpreted as a written contract or guarantee of employment." Nordling contends he never received these guidelines.

In 1987 the smooth course of Nordling's employment changed. David McGannon became the new Vice–President of Law and, apparently to the surprise of others, promoted Gary Johnson to Director of Law. That spring, too, NSP was planning construction of a new power facility and, in connection with the project, hired an outside attorney as an advisor on security matters. McGannon told Nordling about a "plan," apparently recommended by the outside attorney, to have an investigation of the personal lifestyles of NSP employees at the new plant facility. What Nordling believed the plan to include is unclear; there was a suggestion that the investigation would include surveillance of employees on site and at home, and Nordling said he thought the plan had "the connotation of conducting illegal activities." At any rate, Nordling voiced his objections to McGannon and Johnson. He then reported the investigation plan to the general manager for the construction project, who, in turn, reported the plan to others higher up in the company, where the proposed plan was promptly killed.

In April 1987 McGannon began monitoring Nordling's personal phone calls. Next McGannon gave Nordling a memo instructing him to meet certain guidelines or he would be placed on Positive Discipline. Nordling immediately met with McGannon, claiming criticism of his conduct was unwarranted. At the end of the meeting, McGannon retracted the memo. In any event, McGannon apparently felt Nordling was resentful for not having received the promotion that went to Johnson. Also, McGannon noted that another attorney in the legal department, Jack S. Sjoholm, had reported disparaging comments made by Nordling. Nordling denies making the comments.

On November 30, 1987, McGannon summarily discharged Nordling without warning. None of the Positive Discipline steps had been applied. McGannon's reasons for the discharge were vague. He told Nordling that Nordling seemed unhappy, did not fit in the Law Department, and was unsocial. When Nordling then sought employment in NSP's engineering department, McGannon successfully opposed the move.

Nordling then commenced this lawsuit against his employer, NSP, and David McGannon. Later he commenced a second lawsuit against co-attorney Jack Sjoholm. Nordling alleged six claims: (1) breach of contractual rights under the employee handbook; (2) violation of the whistleblower statute; (3) implied-in-law covenant of good faith and fairness; (4) implied-in-fact covenant of good faith and fairness; (5) defamation; and (6) tortious interference with contract and prospective relations against McGannon and Sjoholm.

After extensive discovery, the trial court, on several summary judgment motions, dismissed on their merits the claims based on defamation, implied-in-law covenant breach, and the whistleblowing violation. This left intact the claims for breach of contract, implied-in-fact covenant breach, and tortious interference. At this point, NSP again moved for summary judgment on the remaining claims on the grounds that Nordling had been employed as an attorney by NSP and NSP, as the client, was free to terminate the attorney-client relationship at any time for any reason.

The trial court agreed the attorney-client relationship barred Nordling's claims and dismissed the lawsuits. On appeal, a divided court of appeals panel affirmed. *Nordling v. Northern States Power Co.,* 465 N.W.2d 81 (Minn.App.1991). We granted Nordling's petition for further review.

The main issue is whether an attorney's status as in-house counsel alters the ordinary attorney-client relationship under which the client has the right to discharge its attorney at any time. We first take up this issue as it relates to the breach of

contract claim and we then discuss plaintiff's other claims.

## I.

The trial court has ruled there is a jury issue whether Nordling had a contractual right not to be discharged without compliance with the progressive disciplinary steps of the employee handbook. *See Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983). It appears there are fact issues whether Nordling was aware of contractual disclaimers given to the supervisors. Assuming a contractual breach might be established, the issue before us is whether Nordling's status as an in-house attorney negates and overrides the employer's contractual obligations under the handbook.

We start with two undeniable facts. First, Nordling is an employee, much like any other corporate employee at the executive level. He works for a private corporation. His employer controls the hours he works, the salary and benefits he receives, and the work to which he is assigned. Nordling is also an attorney, licensed to practice law in this state, and subject to the rules of professional conduct governing all lawyers. Nordling was hired by NSP as an attorney admitted to the bar to do legal work. Consequently, NSP is not only Nordling's employer, but his client.

■ The general rule, long established in this state, is that the client has the right to discharge its attorney with or without cause. *Lawler v. Dunn,* 145 Minn. 281, 284, 176 N.W. 989, 990 (1920). The discharged attorney is entitled to recover in only quantum meruit for services rendered to the time of discharge and is not entitled to breach of contract damages. 145 Minn. at 284, 176 N.W. at 990. This quantum meruit remedy, of course, is of no solace to discharged in-house counsel.

■ At the heart of the attorney-client relationship is the element of trust. If the relationship is to work, the client must confide in the attorney, trusting that the attorney will keep confidences and will ably perform. If the client loses this confidence, whether justifiably or not, the client must be able, without penalty, to end the relationship. The legal matter under consideration, it must be remembered, belongs to the client, not the attorney.

A client retains a lawyer to give sound advice even when that advice may not be what the client wants to hear. The knowledgeable client understands and, it is hoped, values in-house counsel's independence, this quality of personal autonomy which is inherent in any profession that is truly a profession, and which is uniquely essential to the legal profession. Yet the employer-client may argue (as NSP argues here) that it is impossible to trust and confide in inside counsel when that attorney, if discharged, may turn on the employer, disavow his professional obligations, and, while contesting his discharge, divulge company confidences.

The common law rule limiting a discharged lawyer to quantum meruit evolved at a time when lawyers tended to be private practitioners self-employed in a more or less general practice, usually practicing alone or in relatively small partnerships. This kind of law practice is changing; the prevalence of specialization, advertising, and increase in the salaried employment of lawyers, as well as many other factors, have all contributed to a concern by the bar with the meaning of professionalism in today's law practice.[1]

So Nordling argues that the common law rule should be relaxed for in-house counsel.[2] He argues that inside counsel repre-

---

1. *See generally* Schneyer, *Professionalism and Public Policy: The Case of House Counsel,* 2 Geo. J. Legal Ethics 449 (1988).

2. In 1920, when this court adopted the quantum meruit rule in *Lawler v. Dunn,* 145 Minn. 281, 176 N.W. 989 (1920), we noted instances might arise when the rule might be adjusted to fit other circumstances:

> What has been said declaratory of the rule that the attorney is limited to a recovery from a quantum meruit does not relate to a case where the attorney in entering into such a contract has changed his position or incurred expense, or to a case where an attorney is employed under a general retainer for a fixed period to perform legal services in relation to

sent a single client, usually for a career lifetime and usually in a specialized area, and that these characteristics of the practice limit the mobility and marketability of in-house counsel when discharged. Maybe so. But it is not clear to us that these circumstances, which may or may not be present in a particular case, entitle in-house counsel to consideration different from that of private attorneys.[3] It can be argued with equal plausibility that many of those in private practice, who remain subject to the quantum meruit rule, are confronted also with problems of mobility and marketability.

The fact remains, however, that the in-house attorney is also a company employee, and we see no reason to deny the job security aspects of the employer-employee relationship if this can be done without violence to the integrity of the attorney-client relationship. For matters of compensation, promotion, and tenure, inside counsel are ordinarily subject to the same administrative personnel supervision as other company employees. These personnel arrangements differ from the traditional scenario of the self-employed attorney representing a client; and these differences are such, we think, that the elements of client trust and attorney autonomy are less likely to be implicated in the employer-employee aspect of in-house counsel status. In this case, for example, Nordling was covered by the Employee Handbook, which expressly states it is for "all NSP employees." In pointing to Nordling's professional obligations, NSP seeks to avoid its own express contractual obligations to Nordling.

The attorney-client status of in-house counsel has apparently not precluded an inside attorney from suing her company

employer for employment discrimination. *See, e.g., Bellissimo v. Westinghouse Elec. Corp.,* 764 F.2d 175 (3d Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986) (sex discrimination claim maintained by in-house counsel against her employer, although attorney-client defense not asserted); *Jones v. Flagship Int'l,* 793 F.2d 714 (5th Cir.1986) (sex discrimination claim; again, the attorney-client defense not asserted), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Although the attorney-client status is not involved when a private law firm discharges one of its employee attorneys, it is worth noting that the employee attorney, if wrongfully discharged, can bring a claim against his or her employer.

It seems to us, therefore, that in-house counsel should not be precluded from maintaining an action for breach of a contractual provision in an employee handbook, provided, however, that the essentials of the attorney-client relationship are not compromised.

The cause of action brought here is for the employer's failure to comply with the progressive disciplinary steps of its Positive Discipline System. Apparently we do not have a "just cause" type of discharge, nor quite the damages flowing from such a discharge. It is admitted the progressive disciplinary steps were not followed. The issue is whether they should have been. The reasons for the discharge do not appear to implicate company confidences or secrets confided to Nordling. What we have is a case of deteriorating personal relations between an employee and his supervisor. NSP claims that Nordling resented being passed over by McGannon for a promotion. Nordling denies this and

---

matters that may arise during the period of the contract.
145 Minn. at 284–85, 176 N.W. at 990 (*quoting Martin v. Camp,* 219 N.Y. 170, 178, 114 N.E. 46, 48 (1916)). *See also Meagher v. Kavli,* 251 Minn. 477, 492, 88 N.W.2d 871, 882 & n. 4 (1958).

**3.** House counsel apparently comprise about 10 percent of the bar and their presence seems to be increasingly felt. Rosen, *The Inside Counsel Movement, Professional Judgment and Organizational Representation,* 64 Ind.L.J. 479, 482 n. 7

(1989). Yet, as Professor Schneyer points out, there is little hard data on house counsel. Schneyer, *supra* note 1, at 475. Do house counsel have longer relationships with their clients than outside counsel? Is there less professional autonomy for inside counsel than outside counsel? Is job mobility more of a problem for inside or outside counsel or is there much difference? As Professor Schneyer observes, we can only make assumptions about these questions. *Id.*

claims McGannon unreasonably took a dislike to him. While McGannon may have lost trust in Nordling, this is not a loss of trust that necessarily impairs Nordling's attorney-client relationships with the constituencies of the corporate organization. Relevant, we think, is the evidence that Nordling's "clients" in the engineering department for whom he did legal work found him to be competent and personally compatible, as did almost all of his colleagues in the legal department.

Apparently no one is claiming that Nordling might not be discharged if this ultimately should be the employer's decision; rather, the claim is that the employer had not first followed the handbook disciplinary procedures before a termination decision could be made. Nor is Nordling asking for reinstatement. He concedes that NSP retains the right, upon discharge, not to reinstate him. Nordling is not seeking to foist himself upon an unwilling client, which would be inconsistent with an attorney's obligation to withdraw from representation of a client who requests withdrawal. *See* Minn.R.Prof.Conduct 1.16(a)(3). Nordling seeks only money damages for the breach of his contractual rights. *See Parker v. M & T Chems., Inc.,* 236 N.J.Super. 451, 460, 566 A.2d 215, 220 (1989).

Conceivably, in a breach of contract suit, privileged communications may at times become relevant, particularly in a just cause termination. The employee-attorney may claim confidential data is necessary to his proof; or perhaps the client-employer may protest it is being forced into a position where it must waive its client privilege in order to establish its defense. In such situations, Nordling urges that we adopt the approach adopted in *Balla v. Gambro, Inc.,* 203 Ill.App.3d 57, 62, 148 Ill.Dec. 446, 449, 560 N.E.2d 1043, 1046 (1990), *appeal granted,* 135 Ill.2d 553, 151 Ill.Dec. 380, 564 N.E.2d 835 (1990), where the court suggested, in a retaliatory discharge case, that on occasion there may be "countervailing public policies" that will overcome a privileged communication. Presumably any such countervailing public policy reasons would have to be particularly egregious. In *Balla,* for example, the client-employer allegedly was proposing to sell defective kidney dialysis machines. We do not have a *Balla*-type situation here and we do not think it prudent to speculate on how we might rule in a case not before us. We assume the trial court in this case will proceed, if a claim of privilege is raised, as it would with any claim of privilege. The trial court will decide whether or not there is a privilege for the data sought to be used,[4] and, if so, whether the privilege has been waived.[5] Obviously, an in-house attorney is not excused from keeping privileged communications confidential just because he is in-house.

We reverse, therefore, the court of appeals' ruling denying Nordling the right to proceed with his action for breach of contractual provisions in an employee handbook.

■ This seems a good place to discuss Nordling's cause of action for an implied-in-fact covenant of good faith and fairness. The trial court denied NSP's motion for summary judgment on this claim, leaving it for trial. The court of appeals did not reach the issue. This court has not made clear whether it recognizes such a cause of action, but there is no need to go into the question here. After a careful review of the record, we conclude as a matter of law that no covenant could in any event exist in this case. *Cf. Hunt v. IBM Mid Am. Em-*

---

4. For example, in *Mourad v. Automobile Club Ins. Ass'n,* 186 Mich.App. 715, 465 N.W.2d 395, 400 (1991), a discharged house attorney, who also had administrative, nonlegal duties for the company, was allowed to sue his former employer-client on a just cause wrongful discharge claim and no privileged communication was claimed.

5. *See* Rule 1.6, Minn.R.Prof.Conduct. This rule forbids a lawyer from knowingly revealing a client confidence except in six instances: after consent of the client; when required by law or court order; to prevent a crime by the client; to rectify the consequences of a client's criminal act in the furtherance of which the lawyer's services were used; to establish or collect a fee; or to defend the lawyer against an accusation of wrongful conduct.

*ployees Fed. Credit Union,* 384 N.W.2d 853, 858 (Minn.1986).

## II.

██ This brings us then to Nordling's cause of action for retaliatory discharge. This action may lie even though the employee has only an at-will contract. *See, e.g., Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 378, 710 P.2d 1025, 1033 (1985). *See also Phipps v. Clark Oil & Refining Co.,* 408 N.W.2d 569, 570–71 (Minn.1987) (allowing at-will employee to pursue retaliatory discharge claim). The trial court dismissed this count as a matter of law, and the court of appeals did not reach the issue. Nordling claims the trial court should have ruled there was a jury issue on whether or not a retaliatory discharge occurred. He then argues the attorney-client relationship should not bar the action.

██ A retaliatory discharge claim is more likely to implicate the attorney-client relationship, raising issues not only of divulging client confidences, but confidences that relate to client wrongdoing. Two Illinois intermediate appellate court decisions illustrate the contrary points of view on retaliatory discharge actions brought by in-house counsel. In *Herbster v. North Am. Co. for Life & Health Ins.,* 150 Ill.App.3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986), *appeal denied,* 114 Ill.2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728 (1987), *cert. denied,* 484 U.S. 850, 108 S.Ct. 150, 98 L.Ed.2d 105 (1987), the court refused to allow the action, emphasizing the importance of a client's ability to disclose confidences to its attorney and the right of a client to discharge its attorney at will. In *Balla v. Gambro, Inc.,* 203 Ill.App.3d 57, 148 Ill. Dec. 446, 560 N.E.2d 1043 (1990), as we indicated in Part I, *supra,* a different district of the court of appeals allowed the employee-attorney's action, but directed the trial court to sort out whether there were privileged communications and to consider if "countervailing public policies" might overcome the privilege. Any further discussion of the attorney-client defense here, however, would be academic because we agree with the trial court that as a matter of law there was no violation of the whistleblower statute.

Minn.Stat. § 181.932, subd. 1(a) (1990) provides in pertinent part that an employer shall not discharge an employee because

the employee * * * in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

McGannon, head of the legal department, mentioned to Nordling that outside counsel had recommended an investigation or surveillance of employee lifestyles in connection with an audit program. Nordling reported this to the general manager of the construction project who agreed with Nordling that this would be an inappropriate invasion of employee privacy. The general manager reported the matter to his senior vice-president, who in turn met with the chief executive officer, at which time the proposal was promptly squelched.

The trouble with Nordling's claim is that he is unable to identify any federal or state law or rule that was violated or suspected of being violated. We do not know what kind of surveillance or investigation outside counsel may have had in mind, or even if discussions had proceeded that far. Nordling never talked to outside counsel. The idea of surveillance seems distasteful and it may be ill-advised, but that is not to say it would be illegal. *See Corum v. Farm Credit Servs.,* 628 F.Supp. 707, 719 (D.Minn.1986). Significantly, NSP officers outside the legal department never contemplated such a plan and killed it immediately on becoming aware of it.

On this basis, the trial court granted NSP summary judgment, and we agree.

## III.

Lastly, plaintiff-appellant Nordling contends that the court of appeals erred in dismissing his claims for tortious contract interference against defendants David McGannon, vice-president in charge of the legal department, and against Jack Sjo-

holm, a colleague of plaintiff's in the legal department.

■ This issue comes to us in a rather puzzling posture. In 1989, NSP twice moved for summary judgment on the tortious interference claim against McGannon, and twice the motions were denied by the trial court on the grounds that there was a fact question on whether McGannon had terminated Nordling for personal motives outside the scope of his company duties. These were nonappealable orders, and NSP's request that this question (and others) be certified to the court of appeals was denied. In early 1990, NSP moved for summary judgment a third time on the new grounds of the attorney-client relationship. The trial court granted this motion dismissing all remaining claims, including the McGannon claim, apparently on the basis of the attorney-client defense. Also pending at the time was a separate summary judgment motion in which NSP sought dismissal of the tortious interference claim against Sjoholm on the grounds that it had no factual merit. The trial court granted summary judgment in favor of Sjoholm, but on a ground not asserted, namely, that Nordling, as an in-house attorney, served at the will of his client NSP.

The court of appeals mistakenly assumed the trial court had ruled that McGannon, as a matter of law, had acted within the scope of his duties, and the panel "affirmed" that ruling. There was no such ruling to affirm. As to Sjoholm, the court of appeals affirmed the trial court's dismissal of the claim, but on the different grounds that, as a matter of law, a tortious interference claim against a co-employee would not lie here.

In any event, Nordling is before us now aggrieved by a court of appeals' ruling that his tortious interference claims are dismissed on their factual merits, and we must deal with it.[6]

■ First of all, even if Nordling's contract claim based on the employee handbook fails, we believe a tortious interference suit will lie. While we have not previously addressed this exact question, we conclude a tortious interference claim will lie for an at-will employment agreement. The at-will employment subsists at the will of the employer and employee, not at the will of a third party meddler who wrongfully interferes with the contractual relations of others. See Restatement (Second) of Torts § 766 comment g (1979). See also, e.g., Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370, 385–86, 710 P.2d 1025, 1040–41 (1985). The Restatement comment goes on to say, "The fact that the contract is terminable at will, however, is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach." Restatement (Second) of Torts § 766 comment g (1979).

Secondly, Nordling's attorney-client relationship with NSP is not a defense to Nordling's tortious interference claims against McGannon and Sjoholm. McGannon and Sjoholm do not claim they were personal clients of Nordling; neither claims he had a personal client's right to fire Nordling. In this sense, then, the attorney-client relationship between NSP and Nordling cannot be said to bar the tortious interference claims.

■ We now reach the main issue. The general rule is that a party cannot interfere with its own contract. Bouten v. Richard Miller Homes, Inc., 321 N.W.2d 895, 900–01 (Minn.1982). If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort. To allow the officer or

---

**6.** When parties bring a series of partial summary judgment motions, including motions for "reconsideration," and the varying grounds for the motions must be found in the accompanying briefs, it is not always easy for the courts to know the precise issue being raised at any one time. Under new Minn.Gen.R.Prac. 115.- 03(c)(1), effective January 1, 1992, the moving party must now set out in the memorandum of law accompanying the motion for summary judgment a separate statement "of the issues involved which are the grounds for the motion for summary judgment."

agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation. Nevertheless, we recognized in *Bouten* that a corporate officer or agent may be liable for tortious contract interference if he or she acts outside the scope of his or her duties. *Id.*

It is not always easy to determine when a corporate officer or agent's actions are outside the scope of his company responsibilities, *i.e.*, when he is engaged in a personal vendetta or excursion. Particularly is this true in a job termination case where the officer's duties include the evaluation and supervision of the plaintiff employee's performance or the power to participate in the corporate decision to terminate or otherwise discipline the plaintiff.

■ According to the *Restatement*, there is tortious contract interference when one "intentionally and improperly" interferes. *Restatement (Second) of Torts* § 766 (1979). "Improper" is a rather imprecise term but it was apparently used advisedly because of the difficulty of describing in any inclusive fashion what might be tortious. *Cf. Prosser & Keeton on Torts* § 129 at 983–84 (5th ed. 1984). Interference is improper, we might say, if it is without legal justification. Justification or privilege is a defense to an action for tortious interference, *Johnson v. Radde*, 293 Minn. 409, 411, 196 N.W.2d 478, 480 (1972), and justification is lost if bad motive is present. *Restatement (Second) of Torts* § 766 comment s. *See also, e.g., Sorrells v. Garfinckel's*, 565 A.2d 285, 290–91 (D.C.App.1989); *Trimble v. City and County of Denver*, 697 P.2d 716, 726 (Colo.1985). In other words, while bad motive or malice may not be an element of the tort of tortious interference, it is often persuasive evidence on whether the defendant's conduct was proper and justified or improper and not justified. *Stephenson v. Plastics Corp. of Am.*, 276 Minn. 400, 417 n. 17, 150 N.W.2d 668, 680 n. 17 (1967).

In this case the contract interfered with is an employment contract and the alleged interferer is employed by the same employer. It becomes important, therefore, to determine first the scope of the defendant officer or agent's duties with respect to the plaintiff employee's employment. Conceivably, there may be instances where the defendant officer or agent's conduct is decidedly outside the scope of his duties. The more common situation, we think, is when the defendant's conduct is subject to conflicting inferences. In this situation, the defendant's motive becomes critical. While motive or malice is only one factor to consider in determining whether a defendant officer or agent is acting outside the scope of his duties in dealing with the plaintiff employee, it can be the critical factor. *See Stephenson*, 150 N.W.2d at 680 (where this court noted the "extreme importance of motive" in tortious interference cases). For example, in this case Nordling claims McGannon was meddling with his personal phone calls, while McGannon claims he was attempting to determine if Nordling's alleged unexplained absences from work were for personal business on company time.

■ A bad motive is sometimes referred to as malice. In the early case of *Carnes v. St. Paul Union Stockyards Co.*, 164 Minn. 457, 462, 205 N.W. 630, 631–32, 206 N.W. 396 (1925), we said malice, as the term is used in tortious interference cases, meant nothing more than wrongful conduct done without legal justification or excuse, and that actual malice in the sense of ill-will was not essential. As a general statement this is true enough, but in *Carnes* the alleged defendant interferer was not employed by the same company as the plaintiff. In the case we have here, where we must balance a discharged employee's need for a remedy against the concern not to chill company personnel in the performance of their duties, we conclude, when motive or malice becomes relevant on the issue of improper interference, that this malice be actual malice. *Hickman v. Winston County Hosp. Bd.*, 508 So.2d 237, 239 (Ala. 1987); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 24 (1981); *Sorrells v. Garfinckel's*, 565 A.2d at 290–91.

The burden of proving actual malice is on the plaintiff.

On the other hand, the defendant, to show that he had legal justification and excuse for his actions, may show that he was privileged by his position with the common employer to do what he did.

To put the matter another way, we conclude that a company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff employee. *See Sorrells,* 565 A.2d at 292 & n. 7.

■ Whether a tortious interference claim against a co-employee—*i.e.,* an employee without any supervisory role over plaintiff—might ever lie, we need not decide. Whatever Sjoholm did in passing along office gossip or alleged office gossip, it is clear, as a matter of law, that his conduct was not a cause of Nordling's dismissal by McGannon. *Cf. Kufalk v. Hart,* 610 F.Supp. 1178, 1191 (N.D.Ill.1985). We affirm dismissal of the Sjoholm claim.

As to the McGannon claim, the court of appeals' "affirmance" (see earlier discussion) cannot stand; this would leave in place the trial court's rulings that there are fact issues for trial. We reverse, therefore, the court of appeals and remand the claim to the trial court for further proceedings in the light of this opinion.

Reversed and remanded.