Wayne J. KRATZER, Respondent,

v.

WELSH COMPANIES, LLC, Appellant.

No. A06–2284.

Supreme Court of Minnesota.

July 30, 2009.

Jeffrey R. Ansel, Thomas H. Boyd, Justice E. Lindell, Winthrop & Weinstine, P.A., Minneapolis, MN, for appellant.

James H. Kaster and Jessica J. Clay, Nichols, Kaster & Anderson, PLLP, Minneapolis, MN, for respondent.

## OPINION

GILDEA, Justice.

Respondent Wayne Kratzer brought this action against his former employer, Welsh Companies, LLC (Welsh), alleging that Welsh terminated his employment in violation of Minnesota's whistleblower statute, Minn.Stat. § 181.932, subd. 1(a) (2008).[1] The district court granted Welsh's summary judgment motion, but the court of appeals reversed. *Kratzer v. Welsh Cos.*, No. A06–2284, 2008 WL 1747607, at *1 (Minn.App. Apr. 15, 2008).[2] We granted

---

1. Throughout this opinion, the statutes cited are those in effect at the time the alleged conduct occurred (2000 and 2002). Although these statutes have not changed substantively, many have been renumbered.

2. Kratzer alleged six counts against Welsh in his complaint: (1) violation of Minnesota's Whistleblower Act, Minn.Stat. § 181.932 (2002); (2) violation of Minn.Stat. § 181.13 (2002) (failure to pay wages promptly); (3) violation of Minn.Stat. ch. 325C (2002) (misappropriation of trade secrets); (4) unjust enrichment; (5) conversion; and (6) breach of contract. The district court granted summary judgment in favor of Welsh on all six counts. Kratzer appealed the district court's judgment on his whistleblower claim, and the court of appeals reinstated that claim. Welsh counterclaimed against Kratzer for breach of contract and for misappropriation of trade secrets. The district court granted summary judgment in favor of Kratzer on both claims. Welsh appealed the judgment on the misappropriation of trade secrets claim, and the court of appeals reinstated that claim. The only issue before this court is Kratzer's whistleblower claim.

Welsh's petition for review on the whistleblower claim. Because we conclude that Kratzer has not demonstrated that he engaged in protected activity under the whistleblower statute, we reverse.

The record reflects that Kratzer began working with Welsh as a real estate agent in January 1997. Three years later, Kratzer became Assistant Vice President of Investment Sales. In February 2000, Kratzer received a Letter of Understanding/Offer of Employment detailing that Kratzer's supervisor would be Welsh President Robert Angleson, but functionally, Kratzer would report to Pete Rand. The terms of Kratzer's employment included a salary, commissions, health insurance, and a company car.

Kratzer's whistleblower claim stems from a transaction for the purchase of the Park Square Shopping Center (Park Square) in Brooklyn Park, Minnesota. John Hancock Real Estate Investment Group (John Hancock) owned Park Square. In early 2000 John Hancock retained Welsh to act as the brokerage firm in connection with its efforts to sell Park Square. John Hancock set the original list price at $10 million and agreed to pay Welsh a 2.5% commission on the purchase price. Pete Rand acted for Welsh as John Hancock's broker on the Park Square transaction.

Simultaneously with his broker work for John Hancock, Rand also represented WelshInvest, an affiliate of Welsh, in connection with WelshInvest's efforts to acquire properties. When WelshInvest expressed interest in acquiring Park Square, Rand acted as its broker, and Kratzer assisted Rand with the Park Square deal on the acquisition side, representing WelshInvest.

Rand testified that he presented WelshInvest to John Hancock as a potential buyer for the Park Square property. Because he also represented WelshInvest, Rand said that he discussed with John Hancock the potential conflict of interest for the Park Square transaction.[3] According to Rand, John Hancock chose not to pursue WelshInvest as a buyer at the time that Park Square was first on the market because of the conflict. After considering several offers, however, John Hancock changed its mind.

Initially John Hancock received three offers for Park Square: WelshInvest's offer for $8.025 million and two others for $8 million and $8.6 million. Rand testified that John Hancock wanted to complete the sale by the end of 2000, and that only WelshInvest was in a position to complete the deal by that deadline. With WelshInvest as the most viable prospect, John Hancock decided to entertain WelshInvest's offer.

As the predicate for his claims, Kratzer relies on the fact that at some point during negotiations for Park Square, Rand entered into an agreement with WelshInvest for an additional commission. Kratzer characterizes this agreement as WelshInvest agreeing to pay Rand an "extra two points on his commission if he could convince [John] Hancock to lower their asking price by [$1.5 million]."

---

3. The eventual Purchase and Sale Agreement signed by the parties included a paragraph discussing the broker's commission that states, "Buyer and Seller each hereby warrants and represents to the other that it has dealt with no broker or finder in connection with this transaction except Welsh Companies ('the Broker'), and that it is not affiliated with the Broker in any way." Kratzer does not allege in his complaint, and there is no evidence in the record suggesting, that John Hancock did not have knowledge of Rand's brokering on both sides of the Park Square transaction.

WelshInvest ultimately lowered its purchase price offer to $6.5 million. Rand testified that WelshInvest lowered the offer "for a variety of reasons." Rand stated, for example, that during the time that Park Square was on the market, the closure of the anchor store, Rainbow Foods, negatively impacted the value of the property. In August 2000, the deal between John Hancock and WelshInvest nearly fell through.

But on August 29, 2000, WelshInvest purchased Park Square from John Hancock for $6.5 million. According to the complaint, Rand earned an additional $130,000 commission from WelshInvest for securing the price reduction on the transaction.

Sometime in January 2002, WelshInvest decided to sell Park Square. Rand represented WelshInvest in this transaction, and assigned Kratzer to handle marketing materials for the sale. Rand told Kratzer that the sale should not be advertised to John Hancock because Rand did not want John Hancock to question WelshInvest's asking price for Park Square, which was higher than the purchase price WelshInvest paid to John Hancock. Kratzer then questioned Rand regarding the additional commission agreement, and Rand said that John Hancock was not aware of that agreement.

Kratzer told Rand that Kratzer believed it would be illegal to exclude John Hancock from the marketing of the Park Square property.[4] According to Kratzer, Rand responded, "You can go to management if you disagree with me, but if you do, this will be your last deal at Welsh." Rand removed Kratzer from the Park Square sale that day, and removed Krat-

zer's name from marketing materials several weeks later.

Around the same time as this conversation with Rand, Kratzer also met with Angleson to describe what Kratzer thought was illegal conduct on the Park Square transaction. Kratzer contends that Angleson did not address his concerns.

Several months after his meeting with Angleson, Kratzer received a letter from Angleson informing Kratzer that his compensation would be adjusted from that of a salaried employee to the company's standard commission program. Kratzer alleges that on August 30, 2002, he discovered that Rand had prevented Kratzer from receiving a commission he believed he was owed in connection with a different transaction.

On September 6, 2002, Kratzer presented his concerns about Rand, the Park Square transaction, and the actions taken by Angleson and Rand to Welsh's Chief Executive Officer, Dennis Doyle. Doyle told Kratzer that Doyle would "get to the bottom of it," but also stated his desire to maintain his "longterm relationship with Rand." Kratzer alleges that Doyle's attitude toward Kratzer changed after this meeting.

On October 14, 2002, Welsh terminated Kratzer's employment. Angleson stated in an affidavit that Welsh terminated Kratzer's employment because of Kratzer's "lack of productivity and focus in the brokerage area."

As a result of Kratzer's termination and issues surrounding commissions, Kratzer commenced legal action against Welsh. After discovery, Welsh moved for sum-

---

4. Kratzer's deposition testimony clarified that Kratzer thought it would be illegal to exclude John Hancock because he believed the intent of the exclusion was to cover up what Kratzer described as the previous illegality of Rand's failure to disclose the specific terms of his commission agreement to John Hancock.

mary judgment. The district court granted summary judgment on all claims. The court held, in relevant part, that Kratzer failed to establish a prima facie case under the whistleblower statute because the conduct Kratzer reported did not violate any state or federal law or rule adopted pursuant to law, and because Kratzer failed to establish a causal connection between his report and the adverse employment action.

The court of appeals reversed. *Kratzer,* 2008 WL 1747607, at *1. The court held that Rand's activities, as reported by Kratzer, violated Minn. R. 2805.2000, subpart 1(A) (1999).[5] 2008 WL 1747607, at *5–6. This Minnesota rule requires knowing consent to dual agency in a real estate transaction. To interpret language in the rule, the court of appeals referred to the common law. *Id.* at *5. The court noted that at common law "a real estate broker has a fiduciary duty toward the principal," and that one "with a fiduciary duty has a duty to disclose material facts to the persons to whom the duty is owed." *Id.* The court concluded that Rand's commission arrangement with WelshInvest was a material fact and that without knowledge of this arrangement, John Hancock could not give the "knowing consent to the dual representation" required under Rule 2805.2000, subpart 1(A). 2008 WL 1747607, at *5. The court also held that Kratzer's report was made in good faith and that Kratzer

established a prima facie showing of causation. *Id.* at *6. Finally, the court concluded that whether Welsh's reasons for terminating Kratzer's employment were pretextual was a disputed fact question. *Id.* at *7. We granted Welsh's petition for review.[6]

 This case comes to us after the district court granted Welsh's motion for summary judgment. We apply a de novo standard of review to a grant of summary judgment. *Zip Sort, Inc. v. Comm'r of Revenue,* 567 N.W.2d 34, 37 (Minn.1997). Because the district court granted Welsh's summary judgment motion against Kratzer, we view the evidence in the light most favorable to Kratzer. *See Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn.1982). The judgment will be affirmed, however, if no genuine issues of material fact exist and if the court below properly applied the law. *Zip Sort, Inc.,* 567 N.W.2d at 37; *see also* Minn. R. Civ. P. 56.03.

I.

 This issue presented in this case is whether Kratzer engaged in conduct that the whistleblower statute, Minn.Stat. § 181.932, protects. For the whistleblower statute to apply so as to restrict the employer's ability to lawfully terminate an employee, the employee must have engaged in protected conduct. Minn.Stat. § 181.932.[7] Specifically, the statute makes

5. In 2004, the Minnesota Legislature codified this rule. The current provision is located at Minn.Stat. § 82.41, subd. 13 (2008). The 1999 version of the rule provided that "the following acts and practices constitute fraudulent, deceptive, or dishonest practices: A. act on behalf of more than one party to a transaction without the knowledge and consent of all parties." As codified, the language is the same.

6. We granted Welsh's petition for review based on Welsh's statement of the issue, which asks whether a failure to perform a common law duty can support a violation of

the whistleblower statute. In his brief to this court, Kratzer concedes that protection under the whistleblower statute cannot be premised on a report of a common law violation rather than a rule or statutory violation. We therefore do not need to decide in this case whether an employer's failure to perform a common law duty can support a whistleblower claim.

7. Generally in Minnesota, the employer-employee relationship is at-will, which means that an employer may terminate an employee for any reason or for no reason. *Anderson–Johanningmeier v. Mid–Minnesota Women's*

it illegal for an employer to terminate an employee because the employee "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer." Minn.Stat. § 181.932, subd. 1(a). The parties agree that the conduct at issue is Kratzer's report that Rand failed to tell John Hancock about the terms of Rand's commission agreement with WelshInvest.[8] Kratzer argues that this report is protected under the whistleblower statute because it implicates a violation of Minn.Stat. § 82.27 (2002) and Minn. R. 2805.2000 (1999). Welsh argues that Kratzer did not report conduct that violates either the statute or the rule.[9]

■ To state a claim under the whistleblower statute, the employee does not need to identify in the report the exact law that is violated, but the conduct reported must at least implicate a federal or state law. *Abraham v. County of Hennepin,* 639 N.W.2d 342, 354–55 (Minn.2002) ("A whistleblower claim need not identify the specific law or rule that the employee suspects has been violated, so long as there is a federal or state law or rule adopted pursuant to law that is implicated by the employee's complaint, the employee re-

ported the violation or suspected violation in good faith, and the employee alleges facts that, if proven, would constitute a violation of law or rule adopted pursuant to law."). To determine whether Kratzer's report is protected conduct, we turn first to a discussion of the law Kratzer claims his report implicated.

Section 82.27 is a licensing statute that allows the Commissioner of Commerce to deny, revoke, or suspend a real estate broker's license for fraudulent and deceptive practices:

> The commissioner *may* by order deny, suspend or revoke any license or may censure a licensee if the commissioner finds (1) that the order is in the public interest, and (2) that the applicant or licensee or, in the case of a broker, any officer, director, partner, employee or agent or any person occupying a similar status or performing similar functions . . . :
>
> . . .
>
> (b) has engaged in a fraudulent, deceptive, or dishonest practice. . . .

Minn.Stat. § 82.27, subd. 1(b) (2002) (em-

Ctr., Inc., 637 N.W.2d 270, 273 (Minn.2002); *see also* 17 Stephen F. Befort, *Minnesota Practice–Employment Law & Practice* § 11.1 (2d ed. 2003) (discussing the employment-at-will doctrine). The whistleblower statute is one exception to the general at-will relationship. *Nelson v. Productive Alternatives, Inc.,* 715 N.W.2d 452, 454 (Minn.2006).

8. Kratzer also appears to argue that he engaged in protected conduct because he reported his belief that Rand had not disclosed the fact of the dual agency to John Hancock. But the court of appeals found that "nothing in Kratzer's complaint, deposition or affidavit indicates that his reports to [his supervisors] included an allegation that Rand did not disclose the dual representation." *Kratzer,* 2008 WL 1747607, at *4. Kratzer did not submit a petition for review or request for cross-review

on this issue, so any issue as to whether a report of that conduct would be protected activity under the whistleblower statute is not before us.

9. Welsh also argues that the report of a violation of a licensing statute that vests discretion in an executive branch official, such as Minn. Stat. § 82.27, cannot, as a matter of law, constitute protected activity. We need not resolve the question of whether a report of a violation of a discretionary licensing statute constitutes protected activity under the whistleblower statute, because even if it does, the only basis for Kratzer's claim that the statute was violated is his claim that Rand's conduct violated the rule. As set forth below, we conclude that Kratzer did not report activity that violates the rule.

phasis added).[10] The administrative rule at issue defines "fraudulent, deceptive, and dishonest practices" for real estate brokers according to an enumerated list of behaviors:

> For the purposes of Minnesota Statutes, section 82.27, subdivision 1, clause (b), the following acts and practices constitute fraudulent, deceptive, or dishonest practices:
>
> A. act on behalf of more than one party to a transaction without the knowledge and consent of all parties. . . .

Minn. R. 2805.2000, subp. 1(A) (1999) (currently codified at Minn.Stat. § 82.41, subd. 13 (2008)).

## A.

Kratzer argues that Rand's failure to disclose the terms of his fee agreement with WelshInvest violates Minn.Stat. § 82.27, subd. 1(b), because it is a "fraudulent, deceptive, or dishonest practice" as defined by Minnesota Rule 2805.2000.[11] Welsh argues that Rule 2805.2000, subpart 1(A), does not provide a specific disclosure duty that may be violated. The only statutory requirements for disclosure in real estate transactions, according to Welsh, apply to residential—not commercial—transactions under Minn.Stat. § 82.197 (2002).[12]

 The plain language of the rule requires that Rand disclose the fact of his dual agency, and on this record, there is no dispute that the dual agency disclosure was made. The rule does not require that Rand disclose the details of his compensation or anything beyond the fact that he is acting for both sides. *See* Rule 2805.2000, subpart 1(A). This reading is reinforced by the legislature's treatment of disclosures required in the event of a dual agency within the context of a residential transaction. *See* Minn.Stat. § 82.197, subds. 2, 4 (2002) (now codified at Minn.Stat. § 82.22 (2008)). Under these provisions, the legislature has listed the specific things a dual agent must disclose, including a statement that "[d]ual agents may not advocate for one party to the detriment of the other." Minn.Stat. § 82.197, subd. 4 (now codified at Minn.Stat. § 82.22 (2008)) (listing limitations on the representation dual agents can lawfully provide in a residential property transaction). The legislature has thus provided for specific, heightened duties of disclosure in the residential real estate context. The rule at issue in this case, by contrast, includes no such requirements for dual agents in the context of a commercial transaction, like the Park Square transaction, other than the disclosure of the fact of the dual agency.[13]

10. In 2004, the Minnesota Legislature renumbered this provision, but the language remains unchanged. The provision is now located at Minn.Stat. § 82.35 (2008).

11. The court of appeals held that the district court "erred in concluding" that the rule was not valid. *See Kratzer*, 2008 WL 1747607, at *4. We do not read the district court's decision to hold that the rule was invalid. But we need not resolve that issue because the parties do not appear to be challenging the court of appeals' conclusion that the rule was valid. We therefore assume for purposes of this opinion that the rule was valid. *See* Minn. Stat. § 82.27, subd. 2 (2002) (now codified at

Minn.Stat. § 82.35 (2008)) ("The commissioner may promulgate rules further specifying and defining those actions and omissions which constitute fraudulent, deceptive, or dishonest practices.").

12. The legislature renumbered this provision in 2004. It is currently located at Minn.Stat. § 82.22 (2008).

13. We have held that the existence of dual agency does not violate public policy. *PMH Props. v. Nichols*, 263 N.W.2d 799, 802 (Minn. 1978) (holding that dual agency "is not per se against public policy" and "would not be impermissible as a matter of law").

But, Kratzer argues, the meaning of the rule, and therefore the extent of Rand's disclosure obligations, should be informed by the common law. Kratzer notes that under the common law, Rand had a fiduciary duty to John Hancock as its broker. Based on this duty, Kratzer contends that Rand was obligated under the common law to communicate to John Hancock " 'all facts of which he has knowledge which might affect his principal's rights or interests.' " *Magee v. Odden*, 220 Minn. 498, 503, 20 N.W.2d 87, 90 (1945) (quoting *Doyen v. Bauer*, 211 Minn. 140, 145, 300 N.W. 451, 454 (1941)). Because John Hancock did not have all of the material facts, i.e., knowledge of the specific terms of Rand's commission agreement with WelshInvest, Kratzer argues that John Hancock could not have given knowing consent to the dual agency as required by Rule 2805.2000, subpart 1(A).

The court of appeals adopted this approach and decided that it could not ascertain whether John Hancock had "knowledge" or had given "consent" under the rule without examining the meaning of those words under the common law. *Kratzer*, 2008 WL 1747607, at *5. In urging that we affirm the court of appeals, Kratzer argues that the terms "fraud" and "knowledge and consent" are "technical terms with specialized meanings that have been regularly interpreted under the common law." Kratzer argues that we therefore must turn, as did the court of appeals, to the common law to interpret these terms. But Kratzer has not demonstrated that the terms "knowledge and consent" are "technical" terms in the statutory context presented here.

█ Kratzer has not otherwise provided a reason we should look outside the plain language of the rule. We look beyond the plain language of the statutory or regulatory provision only if the text is ambiguous. *State v. Gorman*, 546 N.W.2d 5, 8 (Minn.1996). Ambiguous text is susceptible to more than one reasonable meaning. *Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn.1999). The court of appeals did not find any ambiguity in the rule, and the parties do not argue that the rule is ambiguous. We likewise find no ambiguity in the rule. In a situation such as this, "[w]here the words of [the rule] are clear and free from ambiguity, we have no right to construe or interpret the [rule's] language. Our duty in such a case is to give effect to the [rule's] plain meaning." *Tuma v. Comm'r of Econ. Sec.*, 386 N.W.2d 702, 706 (Minn.1986).

The plain language of the rule is dispositive. The applicable rule provides that the parties must have knowledge of and consent to a broker's "act[ion] on behalf of more than one party to a transaction." Minn. R. 2805.2000, subp. 1(A). The clear language, therefore, requires "knowledge and consent" of the fact of the dual agency relationship, but not any other particular disclosures. Because the rule does not require that Rand disclose the terms of his commission agreement to John Hancock, Kratzer's report that Rand did not make this disclosure did not implicate a violation of the rule.

**B.**

As an alternative to his argument that Rand's conduct violated the rule, Kratzer argues that whether Rand's conduct actually violated Rule 2805.2000 is immaterial to the question of whether Kratzer engaged in protected conduct. Kratzer contended at oral argument that an actual violation of the rule is not necessary as long as he suspected in good faith that the conduct was a violation of the rule, and that because he did suspect the law was violated, he engaged in protected conduct. We have rejected this argument on at least

three occasions and we do so again in this case.

■ We have "caution[ed] . . . against construing section 181.932 too broadly." *Anderson–Johanningmeier*, 637 N.W.2d at 275; *see also Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 484 n. 1 (Minn.1996) (noting in dicta that the Whistleblower Act does not protect reports based on an employee's subjective notions of wrongdoing, but protects only "an action by a neutral—one who is not personally and uniquely affronted by the employer's unlawful conduct but rather one who 'blows the whistle' for the protection of the general public or, at the least, some third person or persons in addition to the whistleblower"). Consistent with this caution, we have recognized that a mere report of behavior that is problematic or even reprehensible, but not a violation of the law, is not protected conduct under the Whistleblower Act. *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 204 (Minn.2000) (concluding that a report that raised safety concerns about a windshield-wiper device did not allege illegal conduct necessary to support a whistleblower claim); *Hedglin v. City of Willmar*, 582 N.W.2d 897, 902 (Minn.1998) (concluding that a report alleging that firefighters were "showing up at fire calls while drunk" suggested reprehensible conduct but did not present a violation of a law such that the report would be protected); *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 504 (Minn.1991) (concluding that a report about behavior that "seems

distasteful and . . . ill-advised, but that is not . . . illegal" is not protected conduct under the Act).

In our most recent application of this principle, *Obst v. Microtron*, we said: "While there need not be an actual violation of law, the reported conduct must at least implicate a violation of law." 614 N.W.2d at 200. Kratzer and the dissent would read this sentence to mean that the reported conduct need only seem, in the eyes of the employee, to be unlawful, even if that conduct is lawful. We disagree.

■ The proper standard to apply when assessing the legal sufficiency of a claim under the whistleblower statute is to assume that the facts have occurred as reported and then determine, as we said in *Abraham*, whether those facts "constitute a violation of law or rule adopted pursuant to law." 639 N.W.2d at 355 (citing *Obst*, 614 N.W.2d at 204). The sentence in *Obst* thus refers to the existence of the *facts* as reported, it does not stand for the proposition that the law the employee claims to have been violated need not to exist.[14] In other words, to find protected conduct, there need not be an actual violation of the law, as we said in *Obst*, because the facts may not be as the employee reported them to be. Although there need not be an actual violation, the *law* alleged to have been violated must exist. If it later turns out that the facts are not as the employee reported them in good faith to be, the

---

14. The dissent argues that construing the phrase "suspected violation" to relate only to factual allegations makes the sentence from *Obst* dicta, because there were no disputed facts in *Obst*. But in discussing the general principle that "the reported conduct must at least implicate a violation of law," we cited *Hedglin. See Obst*, 614 N.W.2d at 200 (citing *Hedglin*, 582 N.W.2d at 902). In *Hedglin*, the events the employee reported as the basis for his whistleblower claim were very much in dispute. *Hedglin*, 582 N.W.2d at 898 (noting that "[m]any of the facts in this case are still disputed"). These factual disputes did not drive our analysis because we assumed that the facts as alleged were true. *Id.* at 902 ("There may be fact questions as to whether any of these statutes were actually violated, but for purposes of the whistleblower statute, it is irrelevant whether there were any actual violations.").

conduct is protected so long as the facts, if they had been true, would be a violation of the law.[15]

This standard is consistent with the approach we adopted in both *Obst* and *Hedglin.* We recognized in both cases that a report about conduct—assuming that conduct had occurred—that did not violate a state or federal law was not protected activity. *Obst,* 614 N.W.2d at 204; *Hedglin,* 582 N.W.2d at 902. We removed all doubt about the scope of the rule in *Obst* when responding to the dissent. The *Obst* dissent contended that we did not need "to find a law implicated by the conduct reported when the employee's belief that a law was violated was held in good faith." 614 N.W.2d at 204. We said that this view was "simply wrong" and concluded: "it is clear that the report of a suspected violation of federal or state law must implicate an actual federal or state law and not one that does not exist." *Id.*[16]

We reach the same conclusion in this case. Because Kratzer's report does not implicate a violation of any federal or state law or rule, we hold that Kratzer did not engage in protected conduct and, therefore, his whistleblower claim fails as a matter of law.

Reversed.

### DISSENT

MEYER, Justice (dissenting).

I respectfully dissent. The majority opinion correctly states that the question in this case is whether Kratzer's report— that Rand failed to disclose the terms of his commission agreement with WelshInvest to John Hancock—was protected conduct under the whistleblower statute. In its analysis, however, the majority incorrectly limits the whistleblower statute to protect only reports of conduct that actually violate a law or rule, and then unneces-

---

15. Kratzer seemingly recognized this distinction in his brief when he argued that "[e]ven if [he] was *factually mistaken* and John Hancock knew about the dual agency and the incentive fee, if the facts as Kratzer believed them were true, Welsh violated Minn.Stat. § 82.41 and Minn. R. 2805.2000." (Emphasis added.) The dissent also acknowledges this requirement—that an employee must "allege[ ] facts that, if proven, would constitute a violation of law"—when it lays out the general principles applicable to this case. *Abraham,* 639 N.W.2d at 355. But, when it conducts its analysis, the dissent ignores this requirement. For example, the dissent contends that "[a] definitive analysis of the rule does not, and should not, have to be done-the only question is whether a person could suspect, in good faith, that the implicated rule has been violated." Finally, the dissent suggests that in analyzing good faith, "the only question is whether a person could suspect, in good faith, that the implicated rule had been violated," and in this case, "Kratzer's interpretation of the rule supports a conclusion that he was reporting a suspected violation of the rule" because he believed that the failure to disclose was illegal. This analysis

is contrary to *Obst.* There, we said that good faith did "not turn on Obst's knowledge or understanding" of the statute when making his reports; instead, good faith turned on the "content of his reports and his purpose in making the reports." 614 N.W.2d at 203.

16. The dissent argues that "requiring employees who wish to make a report of wrongful conduct to have enough knowledge of the law to know if a set of alleged facts would, if proven, be a violation" is somehow unfair or inconsistent with the purpose behind the whistleblower statute. But this is the same policy-based argument that the *Obst* dissent made. 614 N.W.2d at 205, 207 (Gilbert, J., dissenting) (objecting to our "plac[ing] the burden for proving actual violations of the law on those employees for whom whistleblower protections were enacted" and "judging a lay person's understanding of the law" after the fact). We rejected that argument in *Obst. Id.* at 204 (majority opinion) ("Obst's failure to establish that his reports to Microtron implicated a violation or suspected violation of an actual law means that the jury verdict cannot be sustained.").

sarily construes the rule at issue too narrowly. Because the whistleblower statute and our own precedent require a broader construction of the whistleblower statute, I would affirm the court of appeals' reversal of the district court's summary judgment ruling and remand for further proceedings.

As stated by the majority, we review de novo a district court's order of summary judgment to determine whether there is any genuine issue of material fact and whether the district court correctly applied the law. *Zip Sort, Inc. v. Comm'r of Revenue*, 567 N.W.2d 34, 37 (Minn.1997). On appeal, the evidence is viewed in the light most favorable to the party against whom summary judgment was granted. *Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 672 (Minn.2001). The question before us—which reports are protected by the whistleblower statute—is one of statutory interpretation, which we also review de novo. *Gomon v. Northland Family Physicians, Ltd.*, 645 N.W.2d 413, 415–16 (Minn.2002). When interpreting statutes, our goal is to "ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2008). When possible, a statute should be interpreted " 'to give effect to all of its provisions, and no word, phrase, or sentence should be deemed superfluous, void, or insignificant.' " *State v. Larivee*, 656 N.W.2d 226, 229 (Minn.2003) (quoting *Baker v. Ploetz*, 616 N.W.2d 263, 269 (Minn.2000)) (internal quotation marks omitted).

The Whistleblower Act provides in relevant part:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (a) the employee, or a person acting on behalf of an employee, in good faith, reports a violation or *suspected violation* of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official[.]

Minn.Stat. § 181.932, subd. 1 (2008) (emphasis added). The majority limits the meaning of the term suspected violations to suspicions of a factual nature, not suspicions of violations of law or rule. Op. at 22–23 ("If it later turns out that the facts are not as the employee reported them in good faith to be, the conduct is protected so long as the facts, if they had been true, would be a violation of the law."). I believe that limiting an employee's report under the whistleblower statute to conduct that actually violates the law, as a matter of law, is too narrow an interpretation of "suspected violation," and too narrow an interpretation of this court's precedent and policy surrounding the whistleblower statute.

We first did an in-depth examination of the meaning of "a violation or suspected violation of any federal or state law or rule" under the whistleblower statute in *Hedglin v. City of Willmar*, 582 N.W.2d 897 (Minn.1998). We examined whether reports made by three firefighters to their fire department constituted reports of state law violations. *Id.* at 902. After separating the reports into three categories of conduct, we concluded that the first two categories of reported conduct "implicated" a number of statutes. *Id.* After broadly listing the statutes "implicated," we stated:

> There may be fact questions as to whether any of these statutes were actually violated, but for purposes of the whistleblower statute, it is irrelevant whether there were any actual violations; the only requirement is that the reports of state law violations were made in good faith. *See* Minn.Stat.

§ 181.932, subd. 1(a). Because [the] reports of roll call sheet falsification and [the] report of firefighters driving fire trucks while drunk implicate possible state law violations, we conclude that these reports are protected by the statute if they were made in good faith. *Id.* We then went on to analyze the third category of reported conduct; because we found "no statute or rule that is violated by such conduct, nor could [the firefighters'] counsel point to any such statute or rule," those reports were not protected. *Id.*

We relied on *Hedglin* soon after in our decision in *Obst v. Microtron, Inc.,* 614 N.W.2d 196 (Minn.2000). In *Obst,* an employee invoked the whistleblower statute by claiming he was terminated because (1) he reported to his employer that it needed to tell the manufacturer to which the company supplied windshield wipers that the employer had deviated from agreed-to wiper control testing requirements; or (2) he reported to the company about defective wiper controls being shipped to the manufacturer. *Id.* at 200. The employee argued both reports were of conduct that violated federal law. *Id.*

On the first claim, we held that the federal law that the employee invoked was not "implicated." *Obst,* 614 N.W.2d at 202. The law only required the manufacturer to be notified of a defect—the manufacturer was well aware of the defect before the employee's report, which was known to the employee. *Id.* at 202–03. The employee's stated purpose in making the reports was to inform the manufacturer, but as the manufacturer knew of the defect, "it is difficult, if not impossible, to say that at the time the reports were made, his purpose was to expose an illegality." *Id.* at 202. We noted that our conclusion did not turn on the employee's knowledge or understanding of the law, but instead turned

on "the content of his reports and his purpose in making the reports at the time they were made." *Id.* at 203.

On the second claim, the federal law at issue was expressly limited to windshield wiper systems in finished motor vehicles, and not to the vehicle's component parts, as shipped by the company. *Id.* at 204. The company's deviation from the testing procedures therefore "did not implicate a violation of law." *Id.* After a discussion of *Hedglin,* we commented that "it is clear that the report of a suspected violation of federal or state law must *implicate* an actual federal or state law and not one that does not exist." *Id.* (emphasis added).

We then relied on *Obst* in our short analysis of this issue in *Abraham v. County of Hennepin:*

> A whistleblower claim need not identify the specific law or rule that the employee suspects has been violated, so long as there is a federal or state law or rule adopted pursuant to law that is *implicated* by the employee's complaint, the employee reported the violation or suspected violation in good faith, and the employee alleges facts that, if proven, would constitute a violation of law or rule adopted pursuant to law.

639 N.W.2d 342, 354–55 (Minn.2002) (emphasis added) (citing *Obst,* 614 N.W.2d at 204). We held that the whistleblower statute "does not require that an employee specifically identify in the pleadings the law or rule adopted pursuant to law that the employee suspects has been violated ... so long as the alleged facts, if proven, would constitute a violation of the law or rule adopted pursuant to law." *Id.* at 355.

The majority relies heavily upon *Obst* to support its assertion that "suspected violation" encompasses only suspect or mistak-

en *facts*.[17] In that decision, we said that "[w]hile there need not be an actual violation of law, the reported conduct must at least implicate a violation of law." 614 N.W.2d at 200. The majority states that the proper reading of this sentence demonstrates that only mistakes in the factual allegations can excuse a report that doesn't actually violate the law. However, such a reading would make that sentence dicta; in *Obst*, the employee knew the facts in the report were true, and there was no dispute as to his factual allegations. *Id.* Instead, the employee was wrong that laws were implicated by those alleged facts. *Id.* at 203. In examining our precedent on this issue, I do not read the language of our decisions to limit protection of the whistleblower statute solely to those employees who have made mistakes on the alleged facts.

I acknowledge, though, that the majority appears to be following a developing trend in this court of construing "violation or suspected violation" in the whistleblower statute more and more narrowly, especially in terms of what can constitute a suspected violation of the law. However, if this trend continues, we will be requiring employees who wish to make a report of wrongful conduct to have enough knowledge of the law to know if a set of alleged facts would, if proven, be a violation as a matter of law. In other words, if the employee suspects wrongful conduct is a violation of a law, and is later determined to be wrong as to the law, that employee loses all protection from the whistleblower statute. Our holding in *Abraham*, that the employee does not have to identify in the pleadings the law or rule suspected to have been violated to be protected by the whistleblower statute, as long as some law is implicated, goes against requiring such legal analysis from employees.[18]

In *Hedglin*, we stated that the reported conduct must "implicate *possible* state law violations," and we continued to use the term "implicated" in referring to the connection between a statute or rule and the whistleblower claim. 582 N.W.2d at 902 (emphasis added). Thus, once a rule is "implicated," the analysis should turn on whether there was a good faith report of a suspected violation of that statute or rule.[19] A definitive analysis of the rule does not, and should not, have to be done—the only

---

17. The majority also relies on *Nordling v. N. States Power Co.*, 478 N.W.2d 498 (Minn. 1991). In that case, the employee made a report to his manager that legal counsel told the employee of outside counsel's recommendation of investigating or surveying employee lifestyles. *Id.* at 504. That proposal was "promptly squelched" by the company's officers. *Id.* The employee could not identify a law or rule that was violated or suspected of being violated—there was no evidence of what type of investigation was recommended, and whether such investigation would have been illegal. *Id.*

18. Narrowing the whistleblower statute to require an employee to only report activity that is known to be a violation as a matter of law also impedes the ultimate purpose of having such an exception to the general at-will rule of employment: to encourage the prompt re-

porting and resolution of potentially unlawful acts by employers, and to protect those employees who do report such matters from retaliatory action. *See* Minn.Stat. § 181.932, subd. 1; *see also Anderson–Johanningmeier v. Mid–Minnesota Women's Ctr., Inc.*, 637 N.W.2d 270, 274–75 (Minn.2002).

19. In *Obst*, we stated that to determine whether a report is made in good faith, "we must look not only at the content of the report, but also at the reporter's purpose in making the report." 614 N.W.2d at 202. "The central question is whether the reports were made for the purpose of blowing the whistle, i.e., to expose an illegality." *Id.* We look at the reporter's purpose before the report was made to ensure that the alleged whistle-blowing report was made to expose the illegality and not to support a belated, after-the-fact whistleblower claim. *Id.*

question is whether a person could suspect, in good faith, that the implicated rule had been violated. *See Hedglin,* 582 N.W.2d at 902 ("[I]t is irrelevant whether there were any actual violations; the only requirement is that the reports of state law violations were made in good faith.").

The crux of this issue then becomes whether Kratzer's report was a good faith report of a suspected violation of the implicated rule, Minn. R. 2805.2000, subp. 1(A) (1999). Under this framework, I contend that Kratzer's report was protected.

Minnesota Statutes § 82.27 (2002) allows a real estate broker's license to be denied, revoked, or suspended for, among other things, engaging in "a fraudulent, deceptive, or dishonest practice." Minn. R. 2805.2000 defines what constitutes fraudulent, deceptive, or dishonest practices. Minnesota Rule 2805.2000, subp. 1(A), makes it a fraudulent, deceptive, or dishonest practice for a real estate broker to "act on behalf of more than one party to a transaction without the knowledge and consent of all parties." The majority concludes that language in Minn. R. 2805.2000, subp. 1(A), clearly and unambiguously requires "knowledge and consent" of only the fact of the dual agency relationship, but requires no other disclosures. The majority relies on the fact that the court of appeals did not find any ambiguity in the rule, and the parties do not argue that the rule is ambiguous. I do not agree with the conclusion that the rule is unambiguous.

We have repeatedly said that statutory language is ambiguous if it is susceptible to more than one reasonable interpretation. *State v. Mauer,* 741 N.W.2d 107, 111 (Minn.2007). The interpretation set forth by Welsh Companies, which is followed by the majority, is that "knowledge and consent" under Minn. R. 2805.2000, subp. 1(A), requires disclosure and consent to

only the existence of the dual agency relationship. The interpretation set forth by Kratzer and the court of appeals, on the other hand, is that "knowledge and consent" are terms of art in a dual agency context, terms that the common law has defined as knowing consent to all material facts that the real estate broker has a fiduciary duty to disclose. *See Kratzer,* 2008 WL 1747607, at *5. Although neither party asserts that the rule is ambiguous, their differing interpretations do not demonstrate a concession to the meaning of the rule. Instead, each asserts a reasonable interpretation of the plain meaning of the rule—making the rule far from "clear and unambiguous."

It is not necessary for us to analyze which interpretation is correct. Suffice it to say that Kratzer's interpretation of the rule supports a conclusion that he was reporting a suspected violation of the rule. *Cf. Obst,* 614 N.W.2d at 203 (concluding that employee's purpose was not to expose an illegality; the law only required the third party to be aware of a defect, and the employee knew the third party was aware). Viewing the facts in the light most favorable to Kratzer, he made a report believing that Rand's failure to disclose the terms of Rand's commission agreement to John Hancock was illegal. Specifically, he believed that the failure to disclose meant that John Hancock's consent to Rand's dual representation was not a knowing consent, and thus that failure was a fraudulent, deceptive, or dishonest practice under Minn.Stat. § 82.27 and Minn. R. 2805.2000. Kratzer has established a genuine issue of material fact on whether he made a good faith report of a suspected violation of the rule, and should be allowed to proceed with his claim. I would therefore affirm the court of appeals' reversal of the district court's sum-

mary judgment ruling and remand for further proceedings.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.