*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1333**

Mary Jo Delaney,
Appellant,

vs.

Cragun Corporation,
Respondent.

**Filed May 9, 2016
Reversed and remanded
Ross, Judge**

Crow Wing County District Court
File No. 18-CV-14-2177

Jonathan G. Steinberg, Chrastil and Steinberg, P.L.L.P., Minneapolis, Minnesota (for appellant)

Roger C. Justin, Benjamin B. Bohnsack, Rinke Noonan, St. Cloud, Minnesota (for respondent)

Considered and decided by Reyes, Presiding Judge; Ross, Judge; and Klaphake, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**ROSS**, Judge

Mary Jo Delaney sued her employer, Cragun Corporation, alleging that Cragun discharged her because she reported sexual harassment, violating the Minnesota Human Rights Act. The district court rejected the allegation and awarded summary judgment to Cragun. But in this appeal, both parties agree that the district court misapplied the law by granting summary judgment on the notion that an MHRA retaliation claim that alleges that the employer fired an employee for reporting sexually offensive conduct fails as a matter of law unless the reported conduct was pervasive enough to support an MHRA sexual-harassment claim. The parties correctly understand that the district court erred on the legal standard, and we hold that Delaney's claim survives Cragun's summary judgment motion. We therefore reverse and remand.

## FACTS

Because the case reached only a preliminary pretrial stage, we will present the facts in the light most favorable to Delaney's civil action. Delaney has worked since 2003 in the laundry department of Cragun Corporation's Brainerd resort. Delaney had a run-in with maintenance employees in September 2013, and she reported it to the maintenance manager. According to Delaney, she was ironing near a laundry-room window and heard two maintenance workers talking outside but apparently directing their discussion toward her. One of them, A.L., told the other, "You can be peeping, . . . and then you can [do this]," and then Delaney saw A.L. gesturing for about 30 seconds as if to simulate masturbating, while he looked at Delaney through the window.

2

Delaney went directly to Cragun's maintenance manager, Mitchell Smith, describing what she saw and heard. Smith told Delaney to inform him if anything else happened. In the meantime, Smith took Delaney's report to Cragun's general manager, Richard Lecy, who directed Smith to tell the two men that their behavior was inappropriate and to document that they were warned. Two documents in Cragun's personnel files memorialize these verbal warnings. Lecy says that he told Smith to advise Delaney to report any repercussions to Smith. But Delaney says that Smith never assured her in this way or told her that Cragun had taken any action at all. Lecy acknowledges that he never told Delaney that the men were warned, citing his own practice not to discuss one employee's discipline with another. Delaney says that she heard that A.L. began telling other employees that she turned him in for sexual harassment.

About two weeks after Delaney told Smith about the maintenance workers' misconduct, Lecy called Delaney into his office to discuss unrelated complaints about her work performance. During this meeting, Delaney expressed her concern that nothing had been done about the laundry-window incident. Lecy told Delaney that she should submit any complaints up the line of supervision—first to her own supervisor (an assistant manager), then to the manager, and finally, if necessary, to Lecy. Delaney testified that the managers ended the meeting before she could discuss her concerns further.

About three weeks after that meeting, Delaney drafted a letter to Smith but did not immediately deliver it. Delaney wrote that her concerns were not being taken seriously enough and that she wanted to know what was done about her complaint. The letter also stated that A.L. had been telling others that she reported him for sexual harassment, and it

3

expressed Delaney's concern that she was being blamed. Delaney amended the yet undelivered letter more than a month later, adding that nothing had been done about the incident and that it still troubled her. Delaney then gave one copy of the letter to assistant housekeeping manager Kristine Warner, asking that the letter be placed in her personnel file, and another to Smith.

Three days after Delaney delivered her letter, on January 3, 2014, Lecy called Delaney into his office. According to Delaney, Lecy raised his voice at her and described the letter as offensive. She says that Lecy asked if Smith had spoken with her, and she said he had not. To this Lecy responded that it was documented that Smith did speak with her. Lecy told her that she knew that she was supposed to complain first to her managers and then to him if she did not see results from her complaint, and she responded that she had come to Lecy soon after the incident but that he would not address her concerns. As the meeting progressed, Lecy first demoted Delaney from her position as a supervisor, then he asked her to resign, and finally he terminated her employment after she refused to resign.

Within a week after Delaney's discharge, Lecy listed three reasons for his decision. The list first included a violation of a rule prohibiting employees from failing to obey instructions, referring to Delaney's failure to report her concerns up the designated chain of supervision. It stated next that Delaney had violated a conduct rule, describing as inattentive her dating of the complaint letter as October 31 when she delivered it at the end of December. And third, the list included Delaney's alleged false statement claiming that Smith had not spoken to her following up on her report.

4

Delaney sued Cragun under the Minnesota Human Rights Act (MHRA), asserting unlawful gender discrimination and reprisal. She also claimed that Cragun violated the Minnesota Personnel Record Review & Access Act.

The district court granted summary judgment to Cragun. It reasoned that because the September incident was not pervasive enough to support an actionable sexual-harassment claim under the MHRA, Cragun's alleged reprisal for Delaney's reporting of that incident could not constitute an MHRA retaliation claim. Delaney appeals.

## D E C I S I O N

Delaney appeals only the district court's grant of summary judgment for her reprisal claim. Summary judgment is appropriate only when the admissible evidence presents no genuine issue of material fact and one party is entitled to judgment as a matter of law. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). We review summary judgment de novo to determine whether the district court properly applied the law and if genuine issues of material fact exist to preclude summary judgment. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010). In doing so, we consider any conflicting evidence in the light most favorable to the party who opposes summary judgment. *Fabio*, 504 N.W.2d at 761.

An actionable reprisal claim exists when an employer "intentionally engage[s] in any reprisal against any person" because she opposed a practice forbidden by the MHRA. Minn. Stat. § 363A.15 (2014). Delaney argues that Cragun fired her for reporting harassment, for challenging Cragun's allegedly insufficient response to it, and for reporting A.L.'s retaliatory bad-mouthing of Delaney to other employees. Because Delaney relies on

5

circumstantial evidence to establish Cragun's motive for discharging her, we will follow the customary burden-shifting analysis established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *See Goins v. West Grp.*, 635 N.W.2d 717, 724 (Minn. 2001).

Under the *McDonnell Douglas* framework, a plaintiff-employee attempting to avoid summary judgment must first establish a prima facie case of a discriminatory motive. *Id.* If the employee succeeds in establishing a prima facie case, the burden shifts to the employer to identify a legitimate nondiscriminatory reason for its adverse employment action against the employee. *Id.* If the employer meets this burden of production, the burden shifts back to the employee, who can then avoid summary judgment only by producing evidence that the employer's reason is mere pretext for unlawful discrimination. *Id.*

For the reasons that follow, we believe the district court erred by concluding that Delaney did not present a prima facie case that Cragun unlawfully retaliated against her. And we hold that she also presented sufficient evidence to avoid summary judgment.

### Delaney's Prima Facie Reprisal Claim

A prima facie claim of reprisal consists of three elements: (1) an employee's engaging in statutorily protected conduct; (2) the employer's taking adverse employment action; and (3) a causal connection between the employee's protected conduct and the employer's adverse action. *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001).

The district court reasoned that because A.L.'s crude laundry-window behavior did not itself constitute an MHRA violation, Delaney's report of that behavior cannot be

statutorily protected conduct and, therefore, Cragun could not have engaged in unlawful MHRA reprisal by retaliating against Delaney for making the report. This reasoning misconstrues the law. As Delaney argues on appeal (and as Cragun acknowledged through counsel at oral argument) Delaney's reporting of the incident is protected conduct under the MHRA even if the reported sexually offensive conduct is not itself pervasive enough to constitute actionable MHRA harassment.

The district court relied on *Kratzer v. Welsh Companies, LLC*, 771 N.W.2d 14 (Minn. 2009), to reason that Delaney could not meet the first element of a prima facie case for an MHRA reprisal claim unless she could establish that she was being punished for reporting an actual violation of the MHRA. But *Kratzer* interprets a provision of Minnesota's Whistleblower Act, which prohibits retaliation for the reporting of a good-faith, reasonable belief that a violation of law has occurred, *see* 771 N.W.2d 14, 18–19 (discussing Minn. Stat. § 181.932, subd. 1 (2014)), while the MHRA has no similar requirement. *Kratzer* therefore does not provide the rule of law defining the first prong of reprisal discrimination under the MHRA.

The supreme court has declined to decide whether an actual violation of the MHRA must have occurred to establish statutorily-protected reporting. *See Bahr v. Capella Univ.*, 788 N.W.2d 76, 82 (Minn. 2010). But caselaw deciding the issue as it has developed concerning the mirror federal statutes offers guidance. Minnesota looks to the interpretation and application of Title VII to define the contours of MHRA litigation because of the clear similarities between the federal law and the MHRA. *Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 623 (Minn. 1988). Federal circuit courts

interpreting Title VII's similar reprisal provision tend to apply a good-faith, reasonable-belief standard, not an actual-violation standard. *See, e.g.*, *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).

We do not discuss further whether a good-faith, reasonable-belief standard applies or whether some lesser standard applies. Cragun reasonably concedes that, at the very least, the district court's actual-violation requirement is erroneous. Delaney was reporting the kind of conduct that constitutes sexually harassing conduct under the MHRA even if the single incident by itself would not sustain an actionable MHRA claim. *See* Minn. Stat. § 363A.08, subd. 2 (2014) (prohibiting employment discrimination based on sex); Minn. Stat. § 363A.03, subd. 13 (2014) (including sexual harassment as sex discrimination); *id.*, subd. 43 (2014) (defining "[s]exual harassment" to include "verbal or physical conduct or communication of a sexual nature" when the conduct creates an "offensive employment . . . environment"). Although offensive sexual conduct does not violate the MHRA until it recurs so frequently or intensely that it causes a hostile work environment, *see Goins*, 635 N.W.2d at 725, the MHRA does not limit retaliation protection to employees who wait to report the offensive conduct until after it has become so pervasive. What would be the point of allowing MHRA retaliation claims only for victim employees who have actually endured and reported actionable sexual harassment, since the sexual harassment itself already provides the employee the grounds for an MHRA claim without any report? Delaney's reporting of A.L.'s gesturing window performance was protected conduct under the act.

8

We turn to Cragun's argument that Delaney's reprisal claim nevertheless fails on the third prong of the prima facie analysis because no causal connection exists between her original report of the incident and her discharge. We reject the argument.

We first observe that we do not agree with Cragun that Delaney's protection from reprisal covered only her initial oral report. Her December letter is also protected conduct, because, reasonably construed in her favor, that letter is a mere extension of her September report. The letter asserted that Delaney wanted to know what action Cragun had taken after she initially complained about the incident. It recounted the graphic nature of the employee's conduct and declared that it had significantly disturbed Delaney. It indicated that she had waited patiently for an answer to her complaint even while A.L. spread the word that she had turned him in and that she felt she was being treated as the wrongdoer. The letter, fairly perceived in the light most favorable to Delaney as the nonmoving party, can be described as an employee's unsophisticated reassertion of her original complaint and her request that Cragun do something about the incident now.

Cragun's argument that no causal link exists between Delaney's protected conduct and her discharge is not convincing. A party can demonstrate a casual link indirectly, relying on circumstances that imply the employer's retaliatory motive. *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 445 (Minn. 1983). Close temporal proximity between the protected conduct and employment termination can itself imply reprisal. *See Potter v. Ernst & Young, LLP*, 622 N.W.2d 141, 145 (Minn. App. 2001); *see also Hubbard*, 330 N.W.2d at 445 (holding that discharge two days after plaintiff complained implied a retaliatory motive for the purposes of the prima facie case). According to at least some

evidence in the record, three days after Delaney gave her letter to Smith and Warner on December 31, she was called into the general manager's office, yelled at, and discharged. That Delaney was terminated days after engaging in the protected conduct allows at least the inference that her complaint caused the discharge. This temporal proximity is sufficient to show causation at this summary judgment stage.

We are not persuaded otherwise by Cragun's emphasis on the fact that Lecy did not seem to decide to discharge Delaney until some point after the meeting began. This fact actually works against Cragun. One might infer (again, reasoning in the light most favorable to Delaney's claims) from Lecy's spontaneous decision to discharge Delaney during the meeting that he became increasingly agitated as Delaney continued to insist that her harassment complaint be taken seriously. It is not overwhelming evidence, but it need not be at this stage. The circumstantial evidence of a retaliatory motive is enough to prevent us from deciding the question of motive as a matter of law.

### Cragun's Nondiscriminatory Reason for the Discharge

The burden now shifts to Cragun to show that admissible evidence would allow a reasonable fact-finder to conclude that Cragun discharged Delaney for a legitimate, nondiscriminatory reason. *See Hoover*, 632 N.W.2d at 542. Cragun implies that Lecy's stated reasons in his post-termination note are the nondiscriminatory reasons for which Cragun discharged Delaney. These again include Delaney's failure to follow the correct reporting procedure by her giving the letter to Smith instead of to her immediate supervisor, Delaney's inattentive misdating of the December letter by backdating it to October, and Delaney's allegedly falsely claiming that Smith had not spoken to her following up after

10

her report to him. These are not compelling reasons for a discharge. But they are nondiscriminatory reasons sufficient for this stage of the *McDonnell Douglas* analysis. This returns the onus to Delaney to show that these reasons are pretextual.

***Cragun's Reasons as Pretext for Discrimination***

To avoid summary judgment through the final stage of the *McDonnell Douglas* analysis, the plaintiff need only show that a fact dispute exists as to whether the stated nondiscriminatory reasons for discharge were really a pretext for an impermissible motive. *See Hoover*, 632 N.W.2d at 546. For example, the *Hoover* court affirmed this court's decision reversing the district court's summary judgment decision, holding that a reasonable fact-finder could find that the employer's proffered nondiscriminatory reason for the discharge was a pretext for discrimination because the evidence taken together created a doubt about the employer's truthfulness. *Id.* at 547. On the same basis, we believe that Delaney presents a material fact dispute.

Two of Lecy's stated reasons for discharging Delaney bear directly on her letter complaining about A.L.'s sexually offensive conduct, and the third reason bears on her statement describing the follow-up to her complaint about that conduct. This aligns all these reasons precariously close to Delaney's harassment report. The first reason, which is Lecy's concern that Delaney failed to follow protocol for the letter, is partly belied by the fact that Delaney in fact delivered one of the copies of the letter to Warner, an assistant manager apparently in the chain of supervision that Lecy had identified for any report by Delaney. Cragun is correct that the letter does not precisely follow Lecy's direction in that she also copied the maintenance supervisor, but that's a pretty thin slice at summary

judgment, particularly when Cragun fired Delaney almost immediately, before she had the chance to move her complaint up to the next-highest supervisor. Similarly close to Delaney's report are the notions that she was fired because she inattentively misdated the December letter and that she lied by denying Smith had followed up with her about her complaint. That Lecy did not intend to discharge Delaney immediately after he saw the date on the letter is enough, under these facts, for a reasonable jury to question the credibility of his reasons and to consider whether his real reason may rest elsewhere. And the notion that the real reason was Delaney's alleged lie about whether she discussed the situation with Smith depends entirely on the jury believing that Lecy truly discharged her for that reason. Given the arguably pretextual infirmities or doubtfulness about the other two reasons, we cannot conclude as a matter of law that a jury would accept the stated dishonesty reason for the discharge or disregard the close relationship between the stated reasons and Delaney's reporting of harassment.

In sum, we cannot overlook the fact that Lecy discharged Delaney during the meeting that he called specifically to discuss Delaney's letter restating her harassment complaint. Nor can we overlook the fact that *all* of Lecy's listed reasons are closely tied to Delaney's delivery of the complaint letter. We believe that this is enough for a jury to put the question of Cragun's motives to the test. Of course a jury might accept Lecy's reasons, or it might reject them but still not find that his real reason was retaliation. These are fact issues that courts do not resolve at summary judgment.

12

For our purposes at this early stage, we believe that Delaney has presented a sufficient showing of unlawful motive and pretext, requiring us to reverse the district court's summary judgment decision.

**Reversed and remanded.**